LANDERS, FRARY & CLARK v. VISCHER PRODUCTS CO. et al.

No. 50 C 1421.

United States District Court,
N. D. Illinois, E. D.

May 1, 1952.

**412**

Daily, Dines, Ross & O'Keefe, Chicago, Ill., for plaintiff.

Walter Hamilton, Zeiss, Barker & Huggins, Chicago, Ill., for defendants.

PERRY, District Judge.

Plaintiff filed this suit for declaratory judgment pursuant to 28 U.S.C.A. § 2201. Plaintiff is a Connecticut corporation. Defendant, Vischer Products Company, is a Delaware corporation. Defendants, Flex-Seal Corporation, and the Northern Trust Company, are Illinois corporations. All individual defendants are Illinois residents and citizens, with the exception of Gertrude V. Bouton, who is a resident and citizen of the State of New Jersey. All defendants entered their appearance and filed answers. The amount in controversy, exclusive of interest and costs, exceeds the sum of $3,000. Federal jurisdiction is founded upon diversity of citizenship, 28 U.S.C.A. § 1332.

On July 16, 1943, the plaintiff and the Vischer Products Company, a former Illinois corporation, completed a commercial transaction, which was evidenced by three written instruments; a loan agreement, a license agreement, and a promissory note. The instruments were executed simultaneously, and can be considered parts of one transaction.

By the terms of the loan agreement, the plaintiff, in consideration of the execution of a license agreement by the Vischer Products Company, agreed to lend the latter company the sum of $100,000. This agreement provided that the loan would be without interest, that it would be repaid by the Vischer Products Company on or before July 16, 1953, and that any royalty payments which might become due to the Vischer corporation under the license agreement, could be retained by the plaintiff to apply on the loan.

The license agreement recited the sole ownership by the Vischer Products Company of three patents, one design and three patent applications, all covering pressure cooker devices. By the terms of this agreement, the Vischer Company granted to the plaintiff "the exclusive right and license to make and use the licensed products and to sell such licensed products throughout the United States, its territories and possessions," subject to certain conditions which have no bearing upon the present controversy. Article 4 embodied the following limitation:

"Licensor agrees, for a period of four (4) years from the date upon which restrictions on the use of materials necessary for quantity manufacture of the Licensed Products for civilian use are substantially removed, not to grant additional licenses under said Patent Rights to make or sell cooking utensils, pressure cookers, or articles related thereto. It is specifically understood and agreed that Licensor retains the right to make, use and sell products embodying inventions of said Patent

Rights, except such products having bodies or containers of Stainless Steel, nor is Licensor precluded from granting licenses to others under said Patent Rights for the manufacture and sale of pressure relief devices and pressure indicators, but Licensor agrees not to sell and not to grant licenses to others to manufacture and sell, closures embodying the inventions of said Patent Rights for use as parts of pressure cookers or canners, not to sell containers designed for cooperation with such closures except as complete pressure cookers or canners, or as bona fide repair parts for pressure cookers or canners sold by Licensor or its licensees. Licensor agrees, further, not to grant to anyone a license to make and sell Licensed Products having containers made of any aluminum-coated material without the written acquiescence of Licensee, and Licensor agrees to offer to Licensee the right to include in the term Licensed Products, and subject to all the terms and provisions of this agreement, containers made of ferrous metal having a non-corrosive coating other than vitreous enamel, prior to manufacturing such containers itself or granting to any other party a license to make Licensed Products embodying such containers. It is specifically understood and agreed that Licensor shall continue to make and sell to, or by authority of Government Claimant Agencies, Licensed Products having containers of Stainless Steel until such time as Licensee is in position fully and expeditiously to supply the demands or authorization of such claimant Agencies, and Licensor agrees to corporate with Licensee in securing contracts from such Claimant Agencies as soon as Licensee is in a position to execute such contracts." By the terms of Articles 5 and 6, the plaintiff agreed to pay to the defendant certain royalties, namely 5% of the net selling price of the licensed products, manufactured and sold, or the sum of $25,000, whichever would be greater. Article 15 provided that the plaintiff might cancel and terminate this agreement upon 60 days written notice.

Pursuant to the loan agreement, the Vischer Products Company, a former Illinois corporation, executed its nonnego-tiable promissory note in the amount of $100,000 payable to the plaintiff on or before 10 years from July 16, 1943.

According to the oral testimony of Alfred Vischer, Jr., the plaintiff corporation, at the time of this commercial transaction, was not concerned with the net worth or the financial status of the Vischer Products Company; and it never requested any financial statement. The plaintiff was aware of Vischer's ownership of the patent rights and looked to the license agreement for reimbursement of the loan.

This same testimony also reflects that as of July 16, 1943, the Vischer corporation occupied a part of one floor at 412 Orleans Street, Chicago, Illinois. This was referred to as an assembly plant although the corporation never owned or maintained any assembly machinery on the premises. This corporation considered itself as being engaged in the manufacture and production of pressure cookers. The parts were manufactured by other firms and shipped to the Vischer Corporation, where they were assembled by hand. The corporation maintained very little inventory of material. The pressure cooker parts were never allowed to remain in the plant any more than two or three days. Between July 1943 and the early part of 1947, the number of employees ranged from three to twenty. This corporation never maintained any transportation facilities; it always relied upon a pickup service, which was rendered by an independent trucking firm. Office furniture was rented. Upon examination as to the ownership of fixtures, Alfred Vischer, Jr., replied: "We did have a couple of desks, little desks, and a coat hanger." During this period, namely July 16, 1943 to February 28, 1947, the proportion of earnings from the assembly operations grew smaller as the income from royalties became larger. As of January 3, 1947, more than 80% of the corporate income was being derived from patent royalties. The resulting federal tax problem was presented to tax consultants, who informed the corporate officers that the Vischer Corporation would be classified as a holding company because the income from patent royalties exceeded 80% of the total corporate in-

come. This corporate status would lead to a very high federal tax. In order to remedy this situation the tax consultants suggested a reorganization. According to this plan, Vischer Products Company, the former Illinois corporation, would be dissolved and a new corporation would be formed to receive the physical assets of the old corporation and to continue the manufacturing operations. The income from the patent royalties, however, was to be paid directly to the shareholders of the old corporation. By this separation of the patents and license agreements from corporate ownership, the corporation would avoid the holding company classification and the consequent increased taxes. Though the shareholders would have to pay a capital gains tax on their shares, which had increased in value, such tax was still considerably less than that which was to be paid by the corporation as a holding company.

On January 31, 1947, Alfred Vischer, Jr., president of the Vischer Products Company addressed a letter to the president of the plaintiff corporation. This letter which involved several matters unrelated to this action, also included the following two paragraphs:

"During our recent meeting in Chicago I had intended to discuss another matter with you but became so engrossed in the subject of your visit that it slipped my mind. We are in danger of being classed as a holding company because of our earnings through licenses, and are contemplating some corporate changes which in no way will change our original intention of having only three manufacturers in the field manufacturing Flex-Seal type cookers.

"In this connection it may be necessary for us to separate our manufacturing activities. We are advised that we have such rights at the present time, but, nevertheless feel that we would like to present this matter to you and have your explicit approval. Accordingly, we are also enclosing a Clarification Agreement, the purpose of which is to clarify certain provisions in our original agreement. As in this connection we are granting Aluminum Company the right to manufacture sterilizers, we also give you the same consideration, since this deal had been specifically excluded by us from the original agreement to protect another manufacturer with whom negotiations were not consummated." On February 4, 1947, the plaintiff responded as follows:

"As far as your corporate problems of a holding company are concerned, we are quite willing to do anything *reasonable* by way of modification of the contract and also whatever is necessary in connection with separating your manufacturing activities."

On February 21, 1947, the Vischer Products Company drew up an agreement, entitled "Amendment to License Agreement", whereby it granted to the plaintiff additional patent rights and whereby plaintiff agreed that a license under the patents could be granted to another corporation provided more than fifty per cent (50%) of its stock was owned by shareholders of the Vischer Products Company and provided that the new corporation should be a substitute licensee and not an additional licensee. This provision is set out in paragraph 4 of the "Amendment".

"It is specifically understood and agreed, by and between the parties hereto, that notwithstanding any provision of Article 4 of said agreement of July 16, 1943, the Licensor, or any future owner or assignee of Licensor's Patent Rights shall have the right at any time after the date hereof to grant a license to another group of individuals, firm, or corporation (more than fifty per cent (50%) of the capital stock or property rights of which is owned by the present stockholder of Licensor) to manufacture, use and sell the subject matter of said Patent Rights which have been retained by Licensor; provided that any such Licensee shall be a substitute for Licensor rather than an additional party having the right to make, use or sell under said Patent Rights. To the extent that this provision may be in conflict with the provision of Article 4 of said license agreement of

July 16, 1943, this provision is intended to be a modification of said Article 4. The provisions of Article 17 of said agreement shall not be applicable to any such substitute license." Plaintiff executed and delivered this agreement shortly after April 2, 1947, after its president Mr. White had consulted with an attorney.

On February 4, 1947, the directors of the Vischer Products Company, by resolution, recommended to its shareholders, that its name be changed to Flex-Seal Corporation and that the corporation be dissolved. On the same day, the shareholders of Vischer Products Company passed resolutions changing its name to Flex-Seal Corporation, and dissolving the corporation. The name was so changed by filing the proper documents in the office of the Secretary of State of Illinois at Springfield, Illinois, and recording them in Cook County, Illinois.

On and prior to February 28, 1947, the Flex-Seal Corporation was engaged in the business of manufacturing, producing and selling pressure cookers. In this connection, it owned and occupied certain real estate and premises in Chicago, Illinois, and, in addition, owned and used, in connection with its business, certain tangible personal property including materials and parts, dies, moulds, machinery and equipment, and various other items of tangible personal property. In addition to this, the Flex-Seal Corporation owned and received the income from certain patents and patent rights as well as income from certain license agreements theretofore entered into by the Flex-Seal Corporation, under its prior name of Vischer Products Company, an Illinois corporation.

On February 28, 1947, the Flex-Seal Corporation transferred and assigned to its stockholders in consideration of the surrender by them of their shares of stock substantially all of its tangible and intangible assets of property. The whole transfer was completed without the knowledge or consent of the plaintiff. No sinking fund or security was made for the discharge, payment or liquidation of the unpaid balance upon the note owned by and made payable to the plaintiff. At the time of transfer, all individual defendants had actual notice of the indebtedness to the plaintiff upon which there remained unpaid the sum of $75,000. The complete transfer of all assets of the Flex-Seal Corporation is evidenced by four separate instruments. By a bill of sale, the physical assets including $57,072.93 were conveyed to the individual defendants, who assumed specifically the corporate indebtedness to the plaintiff. These defendants immediately assigned these assets to the defendant Vischer Products Company, a new Delaware corporation.

By an assignment, the individual defendants received the entire right and title to six contracts and agreements, which included the loan agreement between the plaintiff and Vischer as well as three license agreements. The defendants, who assumed Flex-Seal's obligations under these agreements retained these interests.

By an assignment, Flex-Seal conveyed to the individual defendants the entire right and title in three patents, two design patents and four patent applications. In this instrument the defendants did not assume any corporate liability.

By a quitclaim deed, there was conveyed to John H. Overbeck, Jr., as Trustee, certain parcels of realty. He in turn conveyed this land to the new Delaware corporation. The stated consideration was $1. The new corporation did not assume any liability.

The individual defendants retained their interest in the said patents, patent rights and license agreements in the following proportions:

| | |
|---|---|
| Alfred Vischer, Jr. | 12/30 |
| William Vischer | 2/30 |
| Alfred Vischer III | 2/30 |
| Alfred Vischer, Jr., Trustee, | 2/30 |
| Walter W. Zitzewitz | 4/30 |
| Elmer K. Zitzewitz | 4/30 |
| Gertrude J. Zitzewitz | 1/30 |
| Barbara O. Zitzewitz | 1/30 |
| Gertrude V. Bouton | 2/30 |

On March 11, 1947, the Vischer corporation directed a letter to the plaintiff. The license agreement between the plaintiff and the dissolved Vischer corporation received primary attention. The letter advised that "the rights of Vischer Products Company

in the above Agreement (License Agreement) were distributed to the various stockholders of Vischer Products Company in connection with a liquidation of Vischer Products Company." The plaintiff was directed to make royalty payments to the Northern Trust Company, their agent. The plaintiff was also informed that the corporate obligation to the plaintiff had been assumed by the defendant, Vischer Products Company, the new Delaware corporation. Subsequent to April 2, 1947, the president of the plaintiff corporation returned the signed "Amendment to License Agreement", dated February 21, 1947.

The plaintiff did not manufacture any pressure cookers or parts as provided in the license agreement. In accordance with Article 15, the plaintiff terminated the said license agreement as of October 1, 1947. At the time of the termination, the sum of $43,750 had accrued as royalties and had been credited to the defendant corporation by applying it to the partial retirement of the $100,000 loan. No defendants have made any out of pocket payments on this loan or made any provisions therefor or indicated any plan so to do. The sum of $56,250.00 remains unpaid upon the note of the defendant.

On or about February 28, 1947, the individual defendants entered into an agency agreement with the defendant, the Northern Trust Company, pursuant to which the Northern Trust Company was authorized and directed to, and thereafter until on or about the 2nd day of November 1950, did receive and disburse as agent for said individual defendants, the royalties and income upon the various patents, patent rights and license agreements amounting to the sum of $230,845.96, and in addition thereto the defendant bank, as agent, received the further sum of $7,144.64 which it has retained subject to the order of this Court.

The "Balance Sheet" of the defendant Vischer Products Company, as of November 30, 1951, shows an indebtedness of this corporation to the stockholders in the amount of $86,810.92, which is not to be paid until creditors shall have been satisfied. It also reflects current obligations in the amount of $82,332.06. The "Profit and Loss Statement", as of November 30, 1951, indicates that this corporation earned a net income of $46,503.05 during the first eleven months of 1951.

By this action, the plaintiff seeks a present judgment in the amount of $56,250 or, in the alternative, appropriate equitable relief.

The defendants contend that the court lacks jurisdiction, that the defendants are not guilty of any fraud, either actual or constructive, that the plaintiffs are not present creditors of the defendant corporation, and that the plaintiff ratified the distribution of the corporate assets to the individual defendant shareholders.

■■ The defendants' jurisdictional argument rests upon the theory that the amount in controversy does not exceed $3,000 because the note involved does not come due until July 16, 1953, and hence cannot be in controversy at the present time. This argument cannot be sustained for even if it be held that there is no controversy over the said note, the pleadings, nevertheless, present a controversy involving the alleged fraudulent transfer of corporate assets, the value of which appears upon the face of the complaint. The consequent damage to the plaintiff must be measured by the unpaid balance on the note namely $56,250 for which equitable security has been lost except for this suit. The statutory requirement as to jurisdictional amount is satisfied whenever any property or claim of the parties capable of pecuniary estimation is the subject of litigation and is presented by the pleadings for judicial determination, notwithstanding the fact that the sum is not due or payable at the time of commencement of suit. Schunk v. Moline, Milburn & Stoddart Co., 147 U.S. 500, 13 S.Ct. 416, 37 L.Ed. 255.

■ The plaintiff's prayer for present judgment cannot be granted. The note does not provide for any acceleration and the Court's attention has not been directed to any statute which would afford such relief. The evidence will not support a theory of anticipatory breach. Since the plaintiff presently has no remedy at law,

relief must be sought in the equitable powers of the Court. It is the view of this Court that the evidence in this cause is sufficient to sustain the exercise of these equitable powers.

The transfer of corporate assets to stockholders without adequate consideration, even without intent to defraud, while the creditors are left unpaid or unprovided for is fraudulent as to such creditors. Bouton v. Smith, 113 Ill. 481. The actual intent to defraud is not a necessary element. A constructive fraud will be inferred from the facts and circumstances surrounding the transfer. It will note especially the relationship of the transferee or distributee to the corporation, and it will scrutinize the consideration given in the transfer. "A transfer by stockholders of all the assets of one corporation to another organized by them constitutes a fraud in law upon existing creditors of the old corporation regardless of an honest intent of the stockholders and in such case the creditors may hold the new corporation liable to the extent of the assets received by it. The corporation receiving the assets, regardless of its promise to pay all indebtedness, holds them subject to a lien in favor of the creditors of the transferor. South Chester Tube Co. v. Naismith, 3 Cir., 73 F.2d 13. The assumption of the corporate liability by the transferee, without the consent of the creditor, will not obviate the fraud. There is no privilege to relegate a creditor to a different payor without his consent. Bankers Trust Co. v. Hale & Kilburn Corp., 2 Cir., 84 F.2d 401.

In the case at bar, the evidence clearly shows that the Flex-Seal Corporation transferred all of its assets to its shareholders and to a new corporation, organized by them, for inadequate consideration. An exchange of all corporate assets for the corporate shares cannot be viewed as valuable and adequate consideration because the shares apart from the corporate assets are just so many sheaves of paper. The evidence clearly shows that all individual defendants at the time of transfer had knowledge of the corporate indebtedness to the plaintiff. There is no showing that the defendants made adequate provision for the payments of its debts. No sinking fund or security was established. The assumption of liability by the corporate and individual transferee defendants, a fact upon which they lay great stress, was effected at the time of the distribution without the consent of the plaintiff. The only knowledge the plaintiff had at the time of transfer was the fact that some corporate changes had been recommended and were under consideration. Subsequent to the distribution, there was no effective ratification on the part of the plaintiff as to any features of these transactions. The ultimate disposition of the corporate assets does not tend to aid their cause. Ownership of the assets of the greatest value, the patents and the license agreements, vested in the individual shareholders, while title to the few and less valuable physical assets was placed in the newly organized Delaware corporation, whose indebtedness in the past has greatly exceeded its income. The relative value of the corporate assets is described in the oral testimony of the president of the defendant corporations. The physical assets were never great. The value of the patent rights and license agreements was so great that an extensive manufacturing operation was never established, that eventually the limited manufacturing activities decreased to the point that the corporate income was derived almost totally from royalties. In the view of the Court, the evidence is such as warrants the judicial exercise of equitable powers in declaring the transfer of the corporate assets to the Delaware corporation and the individual defendants constructively fraudulent as to the plaintiff. The transferees and their agents, therefore, hold the assets subject to an equitable lien in favor of the plaintiff. Until the lien is satisfied, the status quo should be maintained by proper injunctive relief.

The defendants advance the argument that the plaintiff presently has no standing as a creditor because the note is not due. This defense cannot prevail. As it relates to a fraudulent conveyance, the term "creditor" has received a liberal construction. The character of the claim, if just and lawful, is not material. It need

418

not be due when the fraudulent transfer is made. It may be absolute or contingent. Dunphy v. Gorman, 29 Ill.App. 132.

▇▇▇ The defendants also urge, as a defense, the alleged ratification by the plaintiff, and in support thereof point to the "Amendment to the License Agreement," signed and submitted by the president of the plaintiff corporation after April 2, 1947. Reading this instrument most favorably to the defendants, the Court is able to find only that the plaintiff released the defendants from a limitation on the number of licenses set out in Article 4 of the original "License Agreement." It is true that at the time the plaintiff corporation submitted the signed "Amendment," it had knowledge, on the basis of the defendant's letter of March 11, 1947, that the rights under their license agreement had been distributed to the stockholders "in connection with a liquidation of Vischer Products Company" and that the newly organized Delaware corporation had assumed the corporate obligations to the plaintiff. Before one can ratify, however, he must have full knowledge of all material facts. In the determination of the question as to whether such knowledge was obtained, the Court will examine the situation in its entirety. In July 1943, when the plaintiff and the defendants commenced their negotiations, the present and future patent rights of the dissolved Vischer Products Company occupied a very important position in these transactions. This is evidenced not only by the introductory recitations of the "License Agreement" but also by the oral testimony of Alfred Vischer, Jr. In January 1947, the plaintiff was advised that certain corporate changes were under advisement so as to avoid being classified as a holding company. The plaintiff replied that it would agree to "reasonable" changes. In view of all circumstances surrounding the entire relationship between the parties, this statement does not warrant the inference that plaintiff thereby agreed to a distribution of the corporate assets to the holders and the new corporation. There is no evidence to show that the plaintiff knew, as of April 2, 1947, that the patent rights themselves and the

rights under the license agreements had been distributed among the defendant shareholders. The plaintiff, on that date, could have well presumed that only certain license agreements were assigned to the shareholders and that ample assets were retained for its protection. In this manner, the corporate income from royalties could be held below the 80% limitation, which, to the knowledge of the plaintiff, was the only announced purpose sought to be achieved by the defendants. Other license agreements and the patents themselves could have well been transferred to the new Delaware corporation. The plaintiff, furthermore, had no knowledge as to the distribution of the physical assets. Due to the plaintiff's reliance upon Vischer Products Company's ownership of these patents at the commencement of negotiations in 1943, it is the Court's view that full disclosure concerning the disposition of these assets should have been made to the plaintiff prior to April 2, 1947, before the plaintiff's subsequent conduct can be considered as an act of ratification. The evidence does not show that this was done; on the contrary, the plaintiff had no information in this respect. Since the plaintiff lacked this material information, it cannot be said that it ratified any of the defendants' acts, and this includes the assumption of corporate liability by the defendant Delaware corporation. Where, as in the case before the bar, only a partial disclosure of all material facts has been made, subsequent behavior will not be construed as a ratification even of those acts, knowledge of which is conveyed to the adverse party by such partial disclosure. It would be only after a full disclosure as to the total distribution of the corporate assets that the defendants could begin to view the plaintiff's subsequent acts as a ratification of the assumption of corporate liability by the defendant Delaware corporation.

Accordingly, the Court will enter a decree, declaring that the transfer of the assets to the individual defendants and the defendant Delaware corporation as constructively fraudulent as to the plaintiff, that these transferees and their agents hold these assets, as well as the profits thereof,

subject to an equitable lien in favor of the plaintiff. The Court will enjoin the individual defendants and the defendant Vischer Products Company from alienating or pledging any of these assets in any manner whatsoever. It will enjoin the individual defendants from either terminating or disturbing Agency Account No. 17955 with the Northern Trust Company as well as any existing license agreement; and it will enjoin the Trust Company from distributing any funds received into this account. The injunction as to all parties defendant will remain in force until this equitable lien is satisfied.