UNITED STATES of America,
Plaintiff,

v.

VIBRADAMP CORPORATION et al.,
Defendant.

Civ. No. 65–792.

United States District Court
S. D. California,
Central Division.

Sept. 7, 1966.

Manuel L. Real, U. S. Atty., Frederick M. Brosio, Jr., and M. Morton Freilich, Asst. U. S. Attys., Los Angeles, Cal., for plaintiff.

Gibson, Dunn & Crutcher, Frederic H. Sturdy, Irwin F. Woodland, Los Angeles, Cal., for defendant Libbey-Owens Ford Glass Co.

Joseph T. Thompson, Beverly Hills, and Stephens, Jones, La Fever & Smith, Los Angeles, Cal., for defendants Frank J. Muller; James Muller; John Muller; Margaret Muller; Mark David Muller; Timothy Muller; Walter Muller; Mary Margaret Thompson; Diana Marite Thompson; Estate of Walter Muller through Frank Muller, Coexecutor, and through United California Bank, a national banking association, Coexecutor; and Frank Muller, in his capacity as Coexecutor of Estate of Walter Muller and as Trustee; and United California Bank, a national banking association, as Trustee.

Swanwick, Donnelly & Proudfit, Los Angeles, Cal., for United California Bank, a national banking association, individually.

Conroy & Conroy, Edward L. Conroy, Los Angeles, Cal., McDermott, Will & Emery, Theodore A. Groenke, Chicago, Ill., for defendant Frank Muller, individually.

## MEMORANDUM OF DECISION AND ORDER

GRAY, District Judge.

All of the defendants in this action have moved to dismiss the Government's amended complaint for various reasons that will be discussed in this memorandum. The matter has been argued and submitted for decision. The facts are as follows:

In 1951, Frank and Walter Muller were principal owners of Vibradamp Corporation, which company sought and obtained, on March 31, 1951, a manufacturing contract from the Department of the Navy. As an inducement to the Navy to execute the contract, Frank Muller, acting for himself and his brother Walter, gave to the Government a written guaranty "that they would provide all necessary working capital to facilitate the Vibradamp Corporation to complete any contract it might receive from the plaintiff" (amended complaint, paragraph XII).

The articles presumably were satisfactorily manufactured, delivered to the Navy, and paid for at least by July 10, 1953, because on about that date the Navy announced that, pursuant to the price determination provisions in the contract, it had determined that the total price should be reduced by about $590,000.00. Vibradamp appealed to the Secretary of the Navy, but apparently did not prosecute the appeal to the bitter end, because, on about May 22, 1957, the Navy Department and Vibradamp made voluntary amendments to the contract which resulted in an agreed determination that the net overpayment by the Government was $663,211.93. No part of this sum has been repaid to the Government, and the present action seeks recovery accordingly.

In the meantime, between December, 1951 and May, 1952, the Muller brothers sold their stock in Vibradamp to Glass Fibers, Inc., which corporation promptly took unto itself substantially all of Vibradamp's assets. Most of these assets were transferred by Glass Fibers, Inc., to itself; the balance were sold to others. In so disposing of Vibradamp's assets, Glass Fibers, Inc., failed to publish and record the notice required by the California Bulk Sales Act, Section 3440.1 of the California Civil Code.

The complaint further alleges that when Glass Fibers, Inc., obtained the principal stock interest in Vibradamp, it wrote, on about May 17, 1952, to the Navy Department that it agreed to guarantee the performance of any contracts with Vibradamp entered into on or after

January 4, 1952 that showed the approval of Glass Fibers, Inc.

In 1955, Glass Fibers, Inc., became part of L-O-F Glass Fibers Company, which took all of its assets and assumed its liabilities. The complaint alleges that at all times here concerned, Libbey-Owens-Ford Glass Company was the parent company and responsible for the operations of L-O-F Glass Fibers Company.

Walter Muller died early in 1961, and on February 3 of that year Frank Muller and the United California Bank became executors under his will. The estate was administered in due course, including the publication of the notice to creditors and the payment of all creditors' claims filed within the six months' period following such publication, all as provided in the California Probate Code (Sections 700–716).

California Probate Code Section 707 states in relevant part that "All claims arising upon contract, whether they are due, not due, or contingent, * * * must be filed or presented within the time limited in the notice * * *; and any claim not so filed or presented is barred forever * * *." No creditor's claim arising under the contract here concerned was filed by the Government in the probate proceedings or asserted in any other manner to the executors.

On April 14, 1965, pursuant to final decree of distribution issued by the probate court, the net estate, consisting of property worth about three million dollars, was distributed by the executors to Frank Muller and the United California Bank as trustees under the will of the decedent. The other individual defendants are beneficiaries of the testamentary trust.

The present action was filed on May 26, 1965 and prays judgment against all of the defendants for $663,211.93, plus interest and costs.

*The Claim Against The Executors*

Both the executors are sued on the ground that, by making full distribution of the probate estate without having withheld sufficient funds to pay the Government's claim, they caused the estate to become insolvent, thereby violating 31 U.S.C. Section 191 and becoming personally liable for the entire claim under Section 192.[1] The executors. challenge such contention, and we shall first consider the issues thereby raised.

At the outset, the Government must be upheld in its argument that, because of its sovereign status, it is not foreclosed simply because it did not file its creditor's claim within the six months' period provided by the California Probate Code. This is the square holding in the case of United States v. Summerlin, 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940).

However, the question still remains whether the Government may remain silent throughout the course of probate and while the estate is distributed pursuant to the order of the probate court, and then hold the executor personally liable for not having paid the Government's claim before making distribution, irrespective of his awareness of such a

1. Section 191
 "Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and affects of an absconding, concealed, or absent debtor are attached

by process of law, as to cases in which an act of bankruptcy is committed."
Section 192
 "Every executor, administrator, or assignee, or other person, who pays, in whole or in part, any debt due by the person or estate for whom or for which he acts before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person and estate to the extent of such payments for the debts so due to the United States, or for so much thereof as may remain due and unpaid."

claim. It is the Government's position that Sections 191 and 192 call for just such a result. The Government argues that, despite the promulgation by the probate court of a final decree directing such distribution, the executor acts at his peril if he distributes the estate without first making certain that no branch of the Federal Government is holding a claim against the estate that it might assert at some time in the near or remote future. It requires little imagination to visualize the extent to which the validity of such a doctrine would impair the closing of probate estates throughout the country.

The decision in *Summerlin* does not sustain the plaintiff's contention in this respect. There, the Government had filed a claim in the probate action and appealed from the order disallowing the claim as "void" because of its having been filed after the statutory period. The Supreme Court ruled that a state statute of limitations could not invalidate the Government's claim, and accordingly reversed the state court decision and remanded the cause "for further proceedings not inconsistent with this opinion." Insofar as appears from Chief Justice Hughes' opinion, the estate had not been distributed and the probate proceedings were still pending. Thus, the probate court retained control of the property of the estate and could, pursuant to the Supreme Court's command, reverse its earlier disallowance of the Government's claim and require it to be paid. Here, the entire estate had been distributed, the executors had received their discharge, and the probate proceedings were concluded, before the plaintiff asserted its claim.

The Government meets the last mentioned circumstances head-on by asserting that " * * * the plaintiff was not a party to the above probate proceeding and is therefore not bound by any of its determinations" (amended complaint, paragraph XXIII), and it cites the following cases in support of its contention: Viles v. Commissioner, 233 F.2d 376 (6th Cir., 1956); United States v. Weisburn, 48 F.Supp. 393 (E.D.Pa., 1943); and

United States v. Munroe, 65 F.Supp. 213 (W.D.Pa., 1946).

In each of these cases, an executor was held personally liable, under Section 192, for having distributed the estate pursuant to a decree of distribution without first paying the debt due to the Government, and even though the Government had not submitted a creditor's claim in the probate proceedings. However, in each of the cases, the executor, at the time of making such distribution, was well aware that the Government was actively asserting its claim.

In *Viles,* the Revenue Agent has advised the executrix of his computation indicating further tax liability and had suggested that no distribution should be made of the remaining assets until settlement of such tax liability.

In *Weisburn,* the Collector of Internal Revenue filed with the executrix a proof of claim for the back taxes due from the decedent, but she nonetheless sought and obtained a confirmation of her account and a decree of distribution which ignored the Government's claim.

Similarly, in *Munroe,* the executrix had been negotiating with representatives of the Commissioner of Internal Revenue for settlement of liability for back income taxes due from the decedent.

In the present case, the Government's claim stems from a guaranty executed by the decedent in 1951, and the complaint asserts that the executors " * * * knew or should have known of the plaintiff's claim against the estate of Walter Muller."

■ Many decisions have held that the fiduciaries referred to in Sections 191 and 192 are liable only if they had knowledge or notice of the debt due the United States. See the cases cited in the annotation in 41 A.L.R.2d 446, 450. And the notice required is *actual knowledge* of such facts as would put a prudent person on inquiry as to the existence of the claim of the United States. Livingston v. Becker, 40 F.2d 673 (E.D. Mo., 1929).

We do not know when the Government first developed the idea that it might claim liability on the guaranty, but there has been no allegation or contention that any such conclusion was asserted to the executors at any time prior to the final distribution of the assets of the estate to the legatees. In the absence of such notice, there lacks any indication as to how it is that the United California Bank, as executor, even knew or should have known of the existence of the 1951 guaranty, much less of the Government's claim based thereon.

Frank Muller, of course, knew of the guaranty that he executed in 1951, but it is not at all certain that he was mindful of it at the time of distribution; and even if he was, it does not follow that he thought of it, or should have thought of it, as constituting a potential basis for a claim of a currently existing debt due to the Government.

It seems to me that these considerations significantly distinguish the present situation from the facts in the three cases cited by the Government. Even if Frank Muller did recognize the existence of potential liability stemming from the 1951 guaranty, was he obliged to arouse this "long sleeping dog" and suggest to the Government that it might assert a claim? Such conduct would hardly be in harmony with the interests of the beneficiaries under the will, to whom the executor has a fiduciary duty. But does the executor nonetheless fail at his peril to remind the Government of all of the potential claims that it might have against the estate and suggest that they be prosecuted?

 Insofar as cases of the type here presented are concerned, I believe that the phrase, "debts due to the United States", as set forth in Sections 191 and 192, is properly interpreted to mean only those debts concerning which the Government has asserted a claim before the distribution is made.

As mentioned above, nothing in the cases cited by the Government is inconsistent with such an interpretation, and this view is in harmony with a number of other decisions. For example, in Want v. C. I. R., 280 F.2d 777 (2d Cir., 1960), the Commissioner of Internal Revenue had sought successfully in the Tax Court to recover from an executor and trustee, in her individual and fiduciary capacities, for the amounts of gift taxes that the Commissioner claimed to have been owed by her settlor and testator. The case was taken to the Second Circuit on a petition for review, and Judge Friendly wrote the resulting opinion, in the course of which he set out the terms of Section 192 and then said:

> "However, it has long been held that a fiduciary is liable only if it had notice of the claim of the United States before making the distribution. [Citing a case] Clearly petitioner would be personally liable, whether under the statute [Section 192] or under § 1026(b), as regards any distribution made out of trust assets after May 25, 1951, when the notice of deficiency was served. And she may also be so liable as to distributions made before then if at the time she had actual notice of the government's intention to hold the trust liable as transferee for the gift tax and penalties on the 1945 gifts. * * *" (Page 783)

The case was remanded for further proceedings with respect to the 1945 gifts. It is worthy of note that "actual notice of the government's intention" to assert liability is much different than recollection of the execution of a twelve year old guaranty and awareness of the possibility that it might form the basis of a claim.

In Field v. United States, 9 Pet. 182, 9 L.Ed. 94 (1835), one Brown had made an assignment for the benefit of creditors under court supervision. The assignees knew of a debt by Brown to the United States and that the United States had demanded payment, but they nonetheless paid the other claims, thus depleting the assets of the debtor, and

the local court confirmed the distribution. The United States brought suit in Federal Court against the assignees and recovered judgment. In affirming the case on appeal, Chief Justice Marshall said:

"If at the time of the confirmation of this tableau of distribution no debts due to the United States had been known to the syndics [assignees], and they had, in ignorance thereof, made a distribution of the whole funds among the other creditors, that might have raised a very different question. But in point of fact, it has not been denied that the syndics, long before that period, had *notice of the existence of the debts* due to the United States; and the present suit was commenced against them in the preceding March." (9 Pet. at 201; 9 L.Ed. at 101.)

Similarly, in United States v. Crocker, 313 F.2d 946, 948 (9th Cir., 1963), the opinion pointed out that

" * * * a receiver appointed by a federal or state court who takes possession and control of the assets of an insolvent debtor must first satisfy obligations due the United States under Section 191. It likewise follows that a receiver who *knowingly* distributes the assets in *disregard* of that priority is personally liable under Section 192." (Italics supplied.) Cf. *King v. United States*, 379 U.S. 329, 85 S.Ct. 427, 13 L.Ed.2d 315 (1964).

■ In light of the above discussion, it is my conclusion that inasmuch as it appears that the executors did not have notice of the Government's claim at the time they made distribution of the decedent's estate, they are not liable for violation of Sections 191 and 192.

*The Claim Against The Distributees*

■ The next question is whether those who received such distribution may be obliged to pay therefrom the claim asserted by the Government. This is an entirely different question from the matter of the right to proceed against the executors under Sections 191 and 192, which we have been considering. It is quite apparent from the cases already discussed in this memorandum that when the Government has a claim against a decedent's estate because of a pre-existing debt of the decedent, it may content itself with notifying the executor or administrator, look to him to preserve the priority accorded by Sections 191 and 192, and otherwise ignore the probate proceedings. Or, the Government may file and prosecute its claim in the probate court in the same manner as any other creditor. It has been held, quite understandably, that if the Government chooses the latter course, it is bound by the determination made by the probate court. United States v. Muntzing, 69 F.Supp. 503 (N.D.W.Va., 1946); United States v. Pate, 47 F.Supp. 965 (W.D.Ark., 1942). See Estate of Werfel, 116 Cal. App.2d 167, 172, 253 P.2d 79 (2d Dist., 1953. But it does not follow from anything that we have yet discussed that the Government may ignore the probate proceeding and then *recover from those to whom the estate is distributed.*

"The jurisdiction of the probate court is a jurisdiction *in rem*, the *rem* being the estate of the decedent which is to be administered and distributed with regard to the rights of creditors, devisees, legatees, and the world; by giving the notice prescribed by the statute, the entire world is called before the court, and the court acquires jurisdiction over all persons for the purpose of determining their rights to any portion of the estate, and every person who may assert any right or interest therein is required to present his claim to the court for its determination, and the decree is binding upon him if he fails to appear and present his claim, as if his claim, after presentation, had been disallowed by the court." Condee, Probate Court Practice, (2d Ed.) Section 24.

The people of California have been relying for many years upon the above expressed concept that probate proceedings are *in rem*. There is ample good

reason for the rule and for the reliance. It is important to the public interest and to the stability of economic transactions for a person to know that property distributed to him pursuant to a final decree of distribution may safely be considered to be his own to be spent or invested as he wishes.

This principle of *in rem* jurisdiction is challenged by the Government, insofar as its claims are concerned, with the statement that "the Government may pursue property into the hands of legatees." In support of such position, it cites three decisions: Waterman v. Canal-Louisiana Bank & Trust Co., 215 U.S. 33, 30 S.Ct. 10, 54 L.Ed. 80 (1909); United States v. Fisher, 57 F.Supp. 410 (E.D.Mich., 1944); and United States v. Anderson, 66 F.Supp. 870 (D.Minn., 1946).

*Waterman* did not involve an attempt to pursue property into the hands of a legatee; the opinion ruled that in a diversity case the Federal Court had the authority to impose its own construction concerning the rights of legatees under a will, irrespective of the ruling of the state probate court. Our own Circuit Court of Appeals has expressed concern over the decision, by asserting the view that

> " * * * the assumption by the federal court of authority to construe the will, now in process of probate, smacks of gratuitous interference rather than of the spirit of comity which ought to obtain between courts of independent and coordinate jurisdictions." Blacker v. Thatcher, 145 F.2d 255, 257, 158 A.L.R. 1 (9th Cir., 1944).

However, the *Waterman* decision was deemed controlling in *Blacker*, and, of course, it would control here too if it were relevant to the issue which it is not.

*Fisher* and *Anderson* are, indeed, square holdings that the Government may ignore the probate proceedings and then recover from the distributees. However, the Court in *Fisher* likened

a probate distributee to any other gratuitous transferee of the debtor, and applied the well known constructive trust doctrine in allowing recovery. In doing so, the Court ignored the significance of the final decree of distribution by the probate court.

*Anderson* relied upon *Waterman*, upon Borer v. Chapman, 119 U.S. 587, 7 S.Ct. 342, 30 L.Ed. 532 (1887), whose facts and result are much similar to *Waterman*, and upon *Summerlin*. For reasons discussed above, these cases are not controlling here.

In view of all of the foregoing, it is my conclusion that the Government should be bound by the probate decree; that the distributees pursuant thereto should take free of the Government's claim; and that no legal authority compels a different result.

### The Claim Against Frank Muller, Individually, As A Guarantor

The complaint says that the Muller brothers signed a guaranty that Vibradamp would be provided "with all necessary working capital to enable it to complete performance of all its obligations" under the manufacturing contracts, and that the Government insisted upon such a guaranty as a condition of its letting the contracts. The natural inference is that the Government was primarily interested in obtaining the articles of manufacture, and that it sought by this means to guard against the possibility that Vibradamp might run out of money before it could complete delivery. My understanding of the term "working capital" is in accord with the manner in which the phrase is used in public utility rate regulation, namely,

> " * * * the sum which the Company *needs to supply from its own funds* for the purpose of enabling it to meet its current obligations as they arise and to operate economically and efficiently." Barnes, The Economics of Public Utility Regulation (1942) 495, quoted in Alabama-Tennessee Natural Gas Co. v. Federal

Power Commission, 203 F.2d 494, 498 (3rd Cir., 1953).

It is not at all certain, as the Government contends, that the guaranty here concerned was meant to include repayment of sums due as a result of redetermination proceedings that culminated several years after the goods were manufactured, delivered, and paid for. In this connection, it is somewhat incongruous that the last cited case involved the fact that the Federal Power Commission, in considering the amount of working capital that a public utility should be allowed, refused to take into account federal income tax obligations that would fall due in the following year.

■ In any event, the question of what the present parties meant in requiring and giving the guaranty involves interpretation of documents, including the written guaranty and the contracts to which it pertains, none of which are before us. Accordingly, whether or not Frank Muller should be found liable on his guaranty cannot properly be determined at this stage of the litigation.

*The Claim Against Vibradamp Corporation, L-O-F Glass Fibers Company, And Libbey-Owens Ford Glass Company*

■ The complaint clearly asserts that there was a redetermination provision in the manufacturing contract that Vibradamp obtained from the Navy in 1951. Vibradamp thereupon assumed a contingent obligation to repay whatever sum, if any, might later be determined to be due the Government pursuant to such redetermination. We now know that the principal net amount of this obligation was $663,211.93, and Vibradamp would appear to be liable for that amount.

■ However, the complaint also asserts that sometime between December 1951 and May 1952, Glass Fibers, Inc., acquired all of the stock of Vibradamp, "stripped" that company of all of its assets, and left it an empty shell. If this is so, it would follow that Glass Fibers, Inc., is liable for Vibradamp's debt to the Government, to the extent of the value of the assets that it received in such liquidation.

"A transfer by stockholders of all the assets of one corporation to another organized by them constitutes a fraud in law upon existing creditors of the old corporation regardless of an honest intent of the stockholders, and in such case the creditors may hold the new corporation liable to the extent of the assets received by it." South Chester Tube Co. v. Naismith, 73 F.2d 13, 14 (3rd Cir., 1934). See also Landers, Frary & Clark v. Vischer Products Co., 104 F.Supp. 411, 417 (N.D.Ill., 1952), and see the opinion affirming such decision, 201 F.2d 319 (7th Cir., 1953).

If the allegations of the complaint are correct, this obligation of Glass Fibers, Inc., along with all of its others, has been assumed by L-O-F Glass Fibers Company and Libbey-Owens Ford Glass Company. In view of the potential liability thus asserted by the complaint against these corporate defendants, it becomes unnecessary at this time to consider whether Vibradamp's letter of May 17, 1952 or its failure to adhere to the notice requirements of the California Bulk Sales Law constitute any further basis for recovery.

*The Matter Of Limitation Of Actions*

■ The defendants urge that the Government should not be able to recover in an action filed in 1965 on a monetary claim that accrued at least seven years earlier.

"Statutes of limitations are primarily designed to assure fairness to defendants. Such statutes 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the

period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" Burnett v. New York Central R. Co., 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965).

The defendants suggest that these principles have as much validity in cases in which the Government is a plaintiff as in any others. I have great sympathy with such a point of view, and, much more important, so does Congress. On July 18, 1966 there was enacted and approved 28 U.S.C. Section 2415, which imposes upon the Government a six year statute of limitations with respect to actions for money founded upon contract. Unfortunately for the defendants here, the period of limitations begins to run only from the date of the enactment of the new statute.

■ In the meantime *Summerlin,* with its assertion that "* * * the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights", is still the law (310 U.S. 414, 416, 60 S.Ct. 1019 (1939)). The corporate defendants seek to overcome this large obstacle to their defense by suggesting that the *Summerlin* rule should be restricted to claims by the United States in its governmental capacity. They urge that here the plaintiff has stepped down from its plane of sovereignty and has entered the domain of business and commerce, and that it accordingly should be subject to the same rules that govern others in this area. Several cases are cited as being in support of this proposition. They are neither controlling nor persuasive in the present situation.

■ In Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 383–384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947) Justice Frankfurter said, in speaking for the Court:

"Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it."

I am obliged to conclude that this rule is equally applicable to matters involving statutes of limitations or laches. The comparable and recent decisions in United States v. 93 Court Corporation, 350 F.2d 386 (2d Cir., 1965) and Haymarket Veterans Uniform Co. v. United States, 338 F.2d 698 (1st Cir., 1964) have come to the same conclusion.

*The Order*

The foregoing analysis leads to the following order:

(a) The motion of Frank Muller and United California Bank for dismissal as to them in their capacities as executors is granted.

(b) The motion of Frank Muller and United California Bank for dismissal as to them in their capacities as trustees is granted. With respect to Frank Muller, his capacities as trustee and executor, concerning which his motion to dismiss is granted, are in contrast to his individual capacity as guarantor. In the last mentioned capacity, he has not sought dismissal, and, for reasons discussed in this memorandum, it could not be accorded to him.

(c) The motions of United California Bank, Frank J. Muller, James Muller, John Muller, Margaret Muller, Mark David Muller, Timothy Muller, Walter Muller, Mary Margaret Thompson and Diana Marite Thompson for dismissal as to them in their individual capacities are granted.

(d) The motion of Libbey-Owens Ford Glass Company for dismissal is denied. It is believed that this memorandum and order serve to narrow and define the issues that must be met by the remaining defendants and that Libbey-Owens Ford Glass Company now will be able to plead without the help it sought by its motions to strike portions of the amended complaint. In reliance upon such belief, the motions to strike are denied.