COLLEGIATE CAP AND GOWN COMPANY, ALLEGED TRANSFEREE OF CAP AND GOWN COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4018–69. Filed December 20, 1972.

*William A. Cromartie* and *Donna C. Rankin,* for the petitioner.
*James F. Hanley, Jr.,* for the respondent.

SIMPSON, *Judge:* The respondent determined that the petitioner was liable as transferee for deficiencies in the income tax of Cap & Gown Co. for the fiscal years 1963 and 1964 in the amounts of $135,827 and $163,958, respectively. The issues in this case have been severed, and the only issue to be decided herein is whether the petitioner is liable as a transferee of Cap & Gown Co. under section 6901, I.R.C. 1954.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Collegiate Cap & Gown Co. (Collegiate), is a corporation, incorporated on January 27, 1966, under the laws of the State of Delaware, which had its principal place of business in Champaign, Ill., at the time of filing its petition in this case. Since its incorporation, Collegiate has been a 100-percent subsidiary of the Cenco Instruments Corp. (Cenco), a publicly held corporation.

Cap & Gown Co. (Cap & Gown), was a corporation incorporated on May 11, 1949, under the laws of the State of Delaware, which also had its principal place of business in Champaign, Ill. It filed its Federal income tax returns for the taxable years ended July 31, 1963, 1964, and 1966, with the district director of internal revenue, Springfield, Ill.

On February 10, 1966, the boards of directors of Cap & Gown, Collegiate, and Cenco adopted and approved an agreement and plan for what the respondent has ruled to be a section 368(a)(1)(C) reorganization. Under the terms of the agreement, Cap & Gown was to transfer its business and substantially all of its assets to Collegiate in return for Collegiate assuming certain debts of Cap & Gown and transferring

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

certain shares of Cenco convertible preferred stock to Cap & Gown. "As soon as practicable" after the closing, Cap & Gown was to distribute the Cenco stock to its shareholders and then dissolve. The Davis and Gelvin families, who owned approximately 73 percent of Cap & Gown's stock, were to receive 102,622 shares of Cenco preferred stock, and this amount of stock was convertible into not more than 9 percent of the total outstanding common stock of Cenco. Furthermore, no Cenco officer or director, or any associate thereof, owned any common stock of Cap & Gown, and no Cap & Gown officer or director, or any associate thereof, owned any common stock of Cenco prior to the reorganization.

In connection with the reorganization agreement, the Davis and Gelvin families guaranteed the payment of $291,490 of Cap & Gown's accounts receivable. To effectuate this guarantee, the board of directors of Collegiate, on April 27, 1966, passed a resolution authorizing its officers to execute "a Guaranty Agreement, Pledge Agreement and Escrow Agreement, relating to the guaranty of the payment of certain outstanding notes receivable of Cap & Gown Company." On the same day, the board also passed a resolution authorizing its directors:

to accept, and enter into, on behalf of this corporation, an Indemnity Agreement relating to state and local taxes of Cap & Gown Company, to be executed by H. I. Gelvin, Philip D. Gelvin, I. W. Davis and I. W. Davis, Jr., stockholders of Cap & Gown Company * * *

Such an agreement was executed by the Davises and the Gelvins, and it provided that for the purposes of indemnification, Collegiate and Cenco "may look to the securities deposited in our existing escrow with The Harris Trust and Savings Bank." The agreement further provided that on May 2, 1971, any property remaining in the escrow, less a reasonable reserve for any unresolved matter covered by the escrow, would be released to the Gelvins and the Davises.

The closing of the agreement and plan of reorganization occurred on May 2, 1966, the day on which the indemnification agreement was executed. Cap & Gown transferred its business, $9,076,354 of its assets, and the rights to any tax refunds that might be payable to it to Collegiate. The only assets it retained were $200,000, which was to be used to pay certain expenses other than taxes, and $45,000, which was to be used to pay a cash dividend. In return, Collegiate executed an assumption agreement in which it assumed all the debts, obligations, taxes, and contracts of Cap & Gown, except those arising out of the closing, those with respect to the distribution of the Cenco stock to Cap & Gown's shareholders, and those involving the liquidation of Cap & Gown. However, the assumption agreement, like the plan of reorganization, expressly provided that "The parties do not intend to confer any benefit hereunder on any creditor of Seller or on

any other party except Seller." As of May 2, 1966, the liabilities of Cap & Gown, other than its Federal income tax liabilities, did not exceed $3,111,780. In addition to assuming certain of Cap & Gown's liabilities, Collegiate directed Harris Trust & Savings Bank (Harris), as transfer agent, to transfer 135,512 shares of Cenco convertible preferred stock to Cap & Gown, and 2,950 shares to an escrow that had been established on that same day. Simultaneously, Cap & Gown appointed Harris its exchange agent, and instructed it to deliver 138,462 shares of Cenco preferred stock to the common shareholders of Cap & Gown upon the surrender by such shareholders of their Cap & Gown stock certificates. If any of Cenco's shares were not delivered to the shareholders by May 2, 1969, they were to be delivered to Cenco, which was to hold the shares for the account of the shareholders who had not surrendered their certificates. On May 4, 1966, Cap & Gown delivered a stock power in blank for 138,462 shares of Cenco preferred stock to Harris, and within a week of the closing, Harris had transferred the bulk of the Cenco preferred stock to the Cap & Gown shareholders.

At the time of the closing, the preferred stock was worth $95–$100 per share, and the common stock into which it was convertible was listed on the New York Stock Exchange. Following the payment of its debts, Cap & Gown surrendered its corporate charter on July 27, 1966. According to its final tax return, filed on December 14, 1966, Cap & Gown's only asset as of July 31, 1966, was $17,835 in cash which was transferred to Collegiate on August 23, 1966. Attached to the final tax return was a copy of the agreement and plan of reorganization.

Prior to the liquidation of Cap & Gown, Carl N. Stewart, as senior vice president and general manager of Cap & Gown, was responsible for the operation of all of the departments of Cap & Gown except sales. This responsibility included the supervision of the preparation of Cap & Gown's Federal income tax returns for fiscal years 1963, 1964, and 1966, and the signing of such returns. Effective May 2, 1966, he became senior vice president/comptroller of the petitioner. While employed by the petitioner, Mr. Stewart was under the supervision of Cenco, and subject to such additional supervision, he continued to carry on for the petitioner as he had for Cap & Gown.

On or before July 29, 1966, Mr. Stewart signed the respondent's standard Form 2045 transferee agreement with respect to Cap & Gown's 1963 fiscal year. The form in relevant part provided:

In consideration of the Commissioner of Internal Revenue not issuing a statutory notice of deficiency to and making an assessment against the * * * transferor, the undersigned, as transferee of assets received from the * * * transferor, assumes and agrees to pay the amounts of * * * Federal income * * * taxes

finally determined or adjudged as due and payable by such transferor for the taxable year(s) ended July 31, 1963, to the extent of the liability at law or in equity as transferee within the meaning of section 6901 * * * .

\*       \*       \*       \*       \*       \*       \*

FURTHER: The undersigned, if a corporation, has, by resolution of its board of directors, been authorized to enter into this agreement and there is attached a copy of the minutes of its board of directors evidencing the authorization and that the terms of this agreement have been included in its corporate minutes.

Collegiate Cap & Gown Company (signed)
Carl N. Stewart *V. Pres.* (signed)

No resolution was attached to the Form 2045, nor do the corporate minutes include any such resolution or the terms of the Form 2045 agreement. A Form 2045 was never signed with respect to Cap & Gown's 1964 fiscal year. No statutory notice of deficiency was ever issued to Cap & Gown for either fiscal year 1963 or 1964.

On or about December 5, 1966, the petitioner paid, on behalf of Cap & Gown, to the Internal Revenue Service $19,661.68, representing payment of audit deficiencies of Cap & Gown for its fiscal years 1963, 1964, and 1965. On December 14, 1966, Cap & Gown filed its final Federal income tax return and reported a loss of $1,241,379. On or about January 5, 1967, a corporation application for tentative refund from carryback of net operating loss (Form 1139) was filed in the name of Gap & Gown requesting that a loss incurred by Gap & Gown for its 1966 fiscal year be carried back to its 1963 and 1964 fiscal years, and that tentative refunds totaling $680,732 be made. Mr. Gelvin, who had been president of Cap & Gown and was then president of Collegiate, signed the application "P. D. Gelvin President," and the request was mailed in an envelope with Collegiate Cap & Gown as return addressee. On or about February 8, 1967, the petitioner received a notice of allowance of tentative carryback adjustment to the 1963 and 1964 fiscal years of Cap & Gown from fiscal year 1966 in total amount of $680,732 plus interest. The documents were addressed to "Collegiate Cap & Gown Company, Transferee of Cap & Gown Company." Pursuant to said allowances, the petitioner received and negotiated two checks totaling $700,813.54 which were made payable to the order of the petitioner as transferee of Cap & Gown. These checks were endorsed "Collegiate Cap & Gown Company Transferee of Cap & Gown Company, 1002 N. Market St., Champaign, Ill. 61820" and stamped "deposit only."

On April 23, 1968, Mr. Gelvin, as president of Collegiate, executed a power of attorney appointing Seidman & Seidman to represent Collegiate before the Internal Revenue Service with respect to Federal income tax matters for the fiscal years ended July 31, 1963, through July 31, 1966.

On August 12, 1968, D. E. Wilson, treasurer of Collegiate, signed a Form 977 consent agreement which purported to extend the period of limitations for assessment against the petitioner for any liability which it might have as transferee of Cap & Gown. The form stated that if it was signed by a corporate officer, the corporate seal must be affixed, or if there was no seal, the resolution authorizing the signing of the agreement must be attached to the form. No seal was affixed, no resolution was attached, and the corporate minutes do not include a resolution authorizing Mr. Wilson to sign such agreement.

On May 13, 1969, the respondent mailed a statutory notice of deficiency to the petitioner, in which he determined that the petitioner was liable as transferee for certain deficiencies of Cap & Gown for the fiscal years 1963 and 1964. The $299,785 in deficiencies arose because of the disallowance of a portion of the net loss carrybacks which had been tentatively allowed in February 1967. On August 7, 1969, the petitioner filed its petition in this Court, which in part alleged that it was not a transferee within the meaning of section 6901.

## OPINION

The parties have argued extensively and vigorously over whether the petitioner was liable as a transferee at law or in equity because of the reorganization agreement in 1966 and the transfer of the assets and business of Cap & Gown to the petitioner, but we need not and do not decide whether that agreement or that transfer gave rise to transferee liability. We need decide only two questions: (1) Whether the respondent has proved that the deficiencies determined against the transferor, Cap & Gown, are presently unpaid, and (2) whether the receipt of the $680,732 refund by the petitioner, pursuant to the tentative carryback adjustment procedure, resulted in its being liable as a transferee in equity with respect to the portion of the refund determined by the respondent to be erroneous.

The respondent has the burden of proving that the petitioner is liable as a transferee (*Ruth Mendelson*, 52 T.C. 727 (1969)), and one of the elements of such proof is the showing that the deficiencies determined against the transferor have not been paid (see *Eileen J. Moran*, 45 T.C. 528 (1966)). To meet this element of proof, the respondent offered copies of the "Certificate of Assessments and Payments" for Cap & Gown with respect to the fiscal years 1963 and 1964. Attached to each certificate was a statement under seal signed by the Service Center Director, in which he certified that the attached certificate was a true and complete transcript of the Cap & Gown account as disclosed by the records of his office. The petitioner ob-

jected, claiming that a proper foundation was not laid for the admission of the certificates.

The United States Code, 28 U.S.C. sec. 1733, provides:

(a) Books or records of account or minutes of proceedings of any department or agency of the United States shall be admissible to prove the act, transaction or occurrence as a memorandum of which the same were made or kept.

(b) Properly authenticated copies or transcripts of any books, records, papers or documents of any department or agency of the United States shall be admitted in evidence equally with the originals thereof.

Subsection (a) has been considered to be a codification of the official records exception to the hearsay rule. *Olender* v. *United States*, 210 F. 2d 795 (C.A. 9, 1954). An official record is admissible if "the facts stated in the document * * * [were] within the personal knowledge and observation of the recording official or his subordinates." (*Olender* v. *United States, supra* at 801.)

In the present case, it is clear that the facts reflected in the record of payments were within the knowledge of the director of the service center or those under his supervision. See *Vloutis* v. *United States*, 219 F. 2d 782 (C.A. 5, 1955). We also find that the copies of the record of payments were properly authenticated within the meaning of subsection (b). To require that a witness be called to authenticate the copies would defeat the purpose of the subsection. See *Olender* v. *United States, supra* at 801. The fact that Collegiate is referred to as a transferee on the certificate does not show that the accounts are inaccurate, as such reference does not concern the accounts and as most of the recorded transactions are supported by other evidence. We, therefore, hold that the evidence is admissible and establishes that the alleged deficiencies were not paid.

The second issue concerns whether the petitioner is liable as a transferee for the portion of the refund which the respondent subsequently determined to be erroneous. Section 6411(a) provides in part: "A taxpayer may file an application for a tentative carryback adjustment of the tax for the prior taxable year affected by a net operating loss carryback, provided in section 172(b) * * *." The predecessor of such provision was enacted in 1945, and the committee report declared its purpose to be to make funds available promptly to corporations that needed them. H. Rept. No. 849, 79th Cong., 1st Sess., 1945 C.B. 566, 569. To assure that the respondent acts promptly on such an application, section 6411(b) requires him to act within a 90-day period and limits the scope of his review to an "examination of the application, to discover omissions and errors of computation therein." However, because the respondent's review of the application is limited, the allowance of an adjustment is tentative. H. Rept. No. 849, *supra*, 1945 C.B. 580–583. To facilitate the recovery of an

adjustment which the respondent later determines to have been erroneous, he may assess a deficiency as if it were due to a mathematical error under section 6213(b)(2) without providing the taxpayer with an opportunity to dispute the assessment. Yet, such method of recovering an erroneous refund is not exclusive; the respondent may send a notice of deficiency and provide the taxpayer with an opportunity to challenge the deficiency before the Tax Court. H. Rept. No. 849, *supra*, 1945 C.B. 583.

It seems clear that to carry out the purposes of the provision allowing tentative carryback adjustments, the remedies available to the respondent to recover a refund made pursuant to such an adjustment should be broadly construed. Under section 6411(b), the respondent can deny an application whenever he finds that it contains a material omission or contains errors which he cannot correct in the time available to him for its review, and his denial of an application is final and not reviewable. Sec. 1.6411–3(c), Income Tax Regs. If the respondent is unable to use the notice of deficiency or notice of liability procedure to recover a refund made under section 6411, there is a real danger that he would feel compelled to act more cautiously in allowing tentative carryback adjustments. If an application is denied, the taxpayer's only recourse is to follow the more time-consuming procedures of filing an ordinary claim for refund, and more taxpayers are likely to be compelled to follow that course if the respondent's attempts to recover refunds, which are made quickly but which are later determined to be erroneous, are made more difficult. We have approved of using the notice of deficiency procedure to recover from a taxpayer a refund secured by an application for a tentative carryback adjustment when the respondent later determined that the refund was erroneous. *John S. Neri*, 54 T.C. 767 (1970); see *Frank B. Polachek*, 22 T.C. 858 (1954). For like reasons, we hold that when as a result of an application for a tentative carryback adjustment, a refund is paid to a transferee of the corporation sustaining the loss, the respondent may use the notice of liability procedure to recover such refund if he later determines that it was erroneous.

The parties have recognized that the petitioner's liability as a transferee must be determined in accordance with State law (*Commissioner* v. *Stern*, 357 U.S. 39, 45 (1958)), and that Illinois law is the applicable State law. Under Illinois law, a transfer of assets for inadequate consideration is considered to be a fraud on creditors and the recipient of the transferred assets is liable, as a transferee, to the transferor's creditors to the extent of the inadequacy of the consideration, plus interest as provided by law. *Landers, Frary & Clark* v. *Vischer Products Co.*, 104 F. Supp. 411 (N.D. Ill. 1952), affd. 201 F. 2d

319 (C.A. 7, 1953); see *First Nat. Bank of Chicago* v. *Commissioner*, 255 F. 2d 759 (C.A. 7, 1958), affirming sub nom. *Marva Trotter Barrow Spaulding*, 27 T.C. 479 (1956).

Under the reorganization agreement, Cap & Gown transferred its assets, its business, and its right to tax refunds, and in return, Cenco transferred valuable stock to Cap & Gown. Such transfers were made at arm's length, and it appears that Cap & Gown received adequate consideration for what it transferred. Nevertheless, there is a question as to what Cap & Gown transferred when it transferred its right to tax refunds and what the petitioner thereby acquired. Cap & Gown could not transfer a right to a refund to which it was not entitled; it must have intended to transfer only that to which it had a legal claim. No doubt the petitioner could not have expected to have acquired more of a refund than that to which Cap & Gown was entitled. Surely, the parties did not intend to provide that in the event the respondent recovered $299,785 of the refund from Cap & Gown, the petitioner should continue to hold the entire $680,732 which had been paid to it. Thus, it seems clear to us that Cap & Gown intended to transfer only the refund to which it was entitled and that the petitioner acquired only such right to a refund. Any excess paid to the petitioner was therefore not bargained for, was merely a windfall, and no consideration was given for it. Of course, it may turn out that the respondent is not entitled to recover the entire refund claimed by him, or any portion thereof, and in that event, the petitioner will be entitled to retain all of the refund which under law belongs to it as transferee of the right of Cap & Gown. We hold that the petitioner is liable as a transferee in equity as to any portion of the refund which exceeds the amount to which it is entitled under law, plus interest as provided by law.

> The parties are directed to move or otherwise act with respect to further proceedings in this case on or before February 14, 1973.