**UNITED STATES of America,
Plaintiff,**

v.

**IDAHO FALLS ASSOCIATES LIMITED PARTNERSHIP; Representatives of Idaho Falls Limited Partnership; ID.7 Valley Care Falls Corporation; Unknown Corporations and Partnerships and Western Health Care Corporation, Defendants.**

**No. 97–00178–E–BLW.**

United States District Court,
D. Idaho.

Sept. 30, 1999.

---

Amy S. Howe, U.S. Attorney's Office, Boise, ID, Evelyn McChesney, U.S. Dept. of Health & Human Services, Office of General Counsel, Seattle, WA, for U.S.

Karl R Decker, Meacham & Decker, Idaho Falls, ID, for Idaho Falls Associates Limited Partnership.

Karl R Decker, Meacham & Decker, Idaho Falls, ID, James W Marks, Holleb & Coff, Chicago, IL, James M Ellis, Holleb & Coff, Chicago, IL, for ID.7 Valley Care Falls Corp.

Donald W Lojek, Lojek Gabbert & Strother, Boise, ID, Donald W Lojek, Lojek & Strother, Boise, ID, for Western Health Care Corp.

### ORDER

WINMILL, District Judge.

The Court has before it a Report and Recommendation (Docket No. 98) filed by the United States Magistrate Judge Mikel H. Williams. The Court has reviewed the record and examined Report pursuant to 28 U.S.C. § 636(b)(1), and finds, notwithstanding the objections of defendant Western Health Care Corporation, that it accurately sets forth the facts and correctly applies the governing legal standards.

Generally, Western Health Care Corporation (WHC) objects to the recommendation that it's Motion for Summary Judgment (Docket No. 29) be denied. Specifically, WHC objects to the following conclusions of the Recommendation: (1) that a genuine issue of material facts exists as to whether the plaintiff United States' claim is entitled to priority; and (2) that a genuine issue of material facts exists as to whether the United States improperly failed to adjust the Medicare payments to avoid overpayment.

The Court reviewed the record de novo, and considered WHC's arguments in sup-

port of it's objections. After such review, the Court arrived at the same conclusions as those set forth in the Report and Recommendation. Accordingly,

NOW THEREFORE IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, that the Report and Recommendation (Docket No. 98) shall be, and the same is hereby, ADOPTED as the decision of the District Court.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that:

(1) Defendant Western Health Care's Motion for Summary Judgment (Docket No. 29) is DENIED;

(2) Defendant Idaho Falls Associate's Motion to Dismiss Western Health Care's Cross Claim (Docket No. 33) is GRANTED;

(3) Defendant ID.7 Valley Care's Motion to Dismiss Amended Complaint (Docket No. 60) is DENIED; and

(4) Defendant Idaho Falls Associate's Motion to Dismiss Amended Complaint (Docket No. 69) is DENIED.

## REPORT AND RECOMMENDATION

WILLIAMS, Chief United States Magistrate Judge.

This action is before the Court for all pre-trial matters pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and District Judge Winmill's Order of Reference (Docket # 16), entered January 23, 1998. Currently pending before the Court for its consideration are the following motions: (1) Defendant Western Health Care's Motion for Summary Judgment (Docket # 29), filed October 20, 1998; (2) Defendant Idaho Falls Associate's Motion to Dismiss Western Health Care's Cross Claim (Docket # 33), filed October 21, 1998; (3) Defendant ID.7 Valley Care's Motion to Dismiss Amended Complaint (Docket # 60), filed January 15, 1999; and (4) Defendant Idaho Falls Associate's Motion to Dismiss Amended Complaint (Docket # 69), filed March 8, 1999.

On April 23, 1999, the Court conducted a hearing on the pending motions with all counsel appearing and participating. Having considered the arguments of counsel and having fully reviewed the legal briefing, the Court issues its Report and Recommendation as follows.

## REPORT

### I. Background

This is an action by the United States Government to recover the overpayment of Medicare funds disbursed to Valley Care Center ("VCC"), a skilled nursing facility located in Idaho Falls, Idaho, in 1994. The Defendants in this action are: (1) Idaho Falls Associates Limited Partnership ("IFA"), the entity which owned VCC during the period of time in which the overpayments were made; (2) ID.7 Valley Care Corporation ("ID.7"), IFA's general partner; and (3) Western Health Care Corporation ("WHC"), a health care management corporation that was appointed receiver of the VCC facility during the pendency of foreclosure action filed against IFA.

The Medicare program is authorized by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395ccc, and is administered by the Health Care Financing Administration ("HCFA"), an agency within the United States Department of Health and Human Services. Under the Medicare Program, skilled nursing facilities such as the VCC are reimbursed for patient care services on the basis of their actual costs. However, interim payments are made throughout the year based on an estimate of what the facility's actual costs will be. In order to accomplish this, Medicare providers are required to submit year end cost reports to a fiscal intermediary charged with handling the day-to-day claims. From this cost report, the intermediary determines whether the interim payments resulted in an overpayment or underpayment for the period in question. Following this determination, the intermediary is required to furnish the provider a

Notice of Program Reimbursement ("NPR"). The NPR advises the provider of the exact amount due to or from Medicare.

In this case, VCC participated in the Medicare program from 1987 until 1994, pursuant to a Medicare Agreement signed by an IFA representative. IFA obtained ownership of the VCC in 1987 when Donald R. Bybee, d/b/a DRB Holdings ("DRB"), sold the facility to Southmark Corporation. Southmark immediately deeded the VCC to IFA who took the property subject to a promissory note and deed of trust executed in favor of DRB. Unfortunately, IFA was unable to fulfill its financial obligations and became delinquent in its payments to DRB by early 1990.

In the spring of that year, Donald Bybee approached Keith Holloway, the President of WHC, and asked him if WHC would act as a receiver of the VCC facility if Bybee filed an action to foreclose on the VCC property. Holloway had several years of experience in the nursing home business, and he and his wife had previously managed financially distressed nursing homes through their corporation, WHC. Bybee knew of Holloway's experience and indicated that he wanted the VCC to remain an on-going licensed health care facility. Mr. Holloway agreed that WHC would act as a receiver should Bybee institute a foreclosure action.

Subsequently, on April 13, 1990, DRB commenced an action in state court against IFA to foreclose on the VCC property. On May 1, 1990, the court appointed WHC as receiver of the VCC.[1] As receiver, WHC managed and controlled all aspects of the VCC until the property was sold at a foreclosure sale on July 29, 1994. Thereafter, WHC continued to control the facility until it was ordered to deliver physical possession of the property to the new owner on September 30, 1994. The receiver-ship was ultimately terminated in September of 1997, when WHC presented a final accounting.

During the period of receivership, WHC submitted claims for Medicare reimbursement to Medicare Northwest, the fiscal intermediary that reimbursed VCC for its patient care services. WHC received interim payments on behalf of VCC and, until 1994, submitted year end cost reports to Medicare Northwest as required. WHC also reimbursed Medicare Northwest for various overpayments which were made to VCC during the period of the receivership. However, in 1994 it failed to do so.

In April of 1994, Medicare Northwest conducted a rate review to determine the appropriate interim Medicare payment to be made to VCC. In order to make that determination, Medicare Northwest relied on the VCC's 1993 cost report and on the VCC's provider statistics for the first three months of 1994. Based on that information, Medicare Northwest advised WHC that the VCC would be reimbursed for 90% of its Medicare Part A charges and 100% of its Medicare Part B charges. This meant that VCC would receive 90% of whatever Part A charges it claimed and 100% of whatever Part B charges it claimed. However, if the charges claimed were in excess of the VCC's actual costs, an overpayment would result, and WHC would be required to reimburse Medicare Northwest for that amount. That is exactly what happened.

On July 29, 1994, the VCC was sold at a trustee sale. However, the property was not actually delivered to the new owner until September 30, 1994. Pursuant to 42 C.F.R. § 413.24(f)(2)(iii), the VCC's 1994 cost report was due 45 days after the facility experienced a change of ownership. Thus, at the outset, the VCC's cost report was due no later than November 13, 1994.

---

1. Approximately one year later, on May 28, 1991, IFA filed a petition for relief under Chapter 11 of the bankruptcy code in the United States Bankruptcy Court for the District of Idaho.

However, WHC did not submit the cost report until September 21, 1995, eleven months after it was due. The cost report, as filed by WHC, indicated that the VCC had received an overpayment in the amount of $221,116. WHC did not remit this amount with the report. On October 26, 1995, Medicare Northwest issued its official Notice of Program Reimbursement indicating that the VCC owed Medicare $240,194. WHC did not pay this amount. However, it did continue to satisfy the claims presented by other VCC creditors.

On April 25, 1997, the United States instituted the present suit to recover the approximately $300,000 in Medicare overpayments made to VCC.[2] However, on August 27, 1997, having learned of this action, the judge presiding over the state court foreclosure proceedings ordered WHC to pay all receivership funds in its possession to the United States. Thus, the debt was reduced by approximately $126,000.[3] The United States now seeks to recover the balance of the sums due. The Amended Complaint, filed on July 8, 1998, alleges that each of the named defendants are liable to the United States for those amounts.

## II. Motion for Summary Judgment (Docket # 29)

### A. Summary Judgment Standard

WHC has moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. When reviewing a motion for summary judgment, the proper inquiry is whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (1993). A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains by

demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is not enough for the [non-moving] party to "rest on mere allegations of denials of his pleadings." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

"When determining if a genuine factual issue ... exists, ... a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Id.* at 249–250, 106 S.Ct. 2505. "The mere existence of a scintilla of evidence in support of the [defendant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [defendants]." *Id.*

The Ninth Circuit has consistently applied the standard for granting summary judgment. *Musick v. Burke*, 913 F.2d 1390 (9th Cir.1990); *Pelletier v. Federal Home Loan Bank*, 968 F.2d 865 (9th Cir. 1992); *Bieghler v. Kleppe*, 633 F.2d 531 (9th Cir.1980).

In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party. To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible un-

---

**2.** This amount includes a late fee assessment as well as interest which has accrued.

**3.** In its Supplemental Response to ID.7's and IFA's Motion to Dismiss (Docket # 81), Plaintiff represents that $126,054.83 of the debt has been repaid.

der the facts and applicable law. *Aronsen v. Crown Zellerbach*, 662 F.2d 584, 591 (9th. Cir.1981).

The Ninth Circuit has recently emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact." *Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir.1992).

> In order to withstand a motion for summary judgment, the non-moving party (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371 (9th Cir.1989).

## B. Discussion

WHC moves for summary judgment as to each cause of action alleged against it in Plaintiff's Amended Complaint. The Amended Complaint alleges essentially two bases on which WHC is liable for the money due to Medicare. First, Plaintiff's Third Claim for Relief alleges that WHC, as the appointed receiver of the VCC, is liable for any amounts due and not paid to the United States in violation of the Federal Priority Statute, 31 U.S.C. § 3713. Additionally, Plaintiff's Fourth Claim for Relief alleges that WHC is liable for the Medicare overpayments on the theories of unjust enrichment and constructive trust. However, WHC asserts that Plaintiff cannot recover under either of these theories as a matter of law.

WHC advances two arguments in support of its position. First, WHC argues that Plaintiff is not entitled to the relief it seeks under the Federal Priority Statute because (1) the Medicare debt did not exist at the time WHC was making payments to other creditors; (2) WHC was not on notice of the existence of the Medicare debt at the time payments to other creditors were made; (3) the claims of competing creditors over which the United States is asserting priority in fact had a higher priority than the United States' claim; and (4) the United States knew that IFA and the VCC were involved in insolvency and foreclosure proceedings but, nevertheless, failed to adjust the Medicare payments to avoid an overpayment to the VCC. Next, WHC contends that the facts of this case do not support the imposition of a constructive trust because WHC never held title to the property which Plaintiff seeks to recover and because WHC never engaged in any wrongful conduct that would warrant a finding of unjust enrichment. The Court will address each of these arguments in turn.

### 1. WHC's Liability Under the Federal Priority Statute

 Plaintiff seeks to recover the overpayment of Medicare funds from WHC pursuant to 31 U.S.C. § 3713. That statute, coined the Federal Priority Statute, creates a priority in favor of debts due the United States and provides in relevant part:

(a)(1) A claim of the United States Government shall be paid first when—

(A) a person indebted to the Government is insolvent and—

(i) the debtor without enough property to pay all debts makes a voluntary assignment of property;

(ii) property of the debtor, if absent, is attached; or

(iii) an act of bankruptcy is committed; ...

(b) A representative of a person or an estate ... paying any part of a debt of the person or estate before paying a claim of the Government is liable to the

extent of the payment for unpaid claims of the Government.

*Id.* Under this provision, an insolvent debtor, or a representative thereof, is obligated to pay a debt owing to the United States before paying the claims of competing creditors when the debtor either voluntarily assigns his property, is absent and his property is attached or commits an act of bankruptcy. *In re Metzger,* 709 F.2d 32, 33–34 (9th Cir.1983). The statute is to be "liberally construed so as to effect the public purpose of securing debts owed to the United States." *United States v. Whitney,* 654 F.2d 607, 609 (9th Cir.1981) (citing *Bramwell v. United States Fidelity & Guaranty Co.,* 269 U.S. 483, 46 S.Ct. 176, 70 L.Ed. 368 (1926)). Thus, a court-appointed receiver who knowingly distributes an insolvent debtor's assets in disregard of the United States' claim may be held personally liable under the Federal Priority Statute. *United States v. Crocker,* 313 F.2d 946, 948–49 (9th Cir.1963). *See also, Whitney,* 654 F.2d at 611 ("[A]ny person with the authority to pay outstanding debts of an insolvent who makes payments in derogation of the United States priority will be liable under [section 3713]."). Finally, the burden is on one seeking exemption from operation of the statute to establish that the priority statute does not apply. *Bramwell,* 269 U.S. at 487, 46 S.Ct. at 177; *Whitney,* 654 F.2d at 609.

In the present case, WHC admits that IFA is indebted to the United States for Medicare overpayments made to VCC in 1994. Moreover, WHC acknowledges that IFA was insolvent by May 28, 1991, the date on which IFA petitioned for bankruptcy. In fact, for the purposes of its summary judgment motion, WHC concedes that IFA committed an act of bankruptcy in one or more of the following ways: (1) by seeking relief under Title 11 of the United States Bankruptcy Code on May 28, 1991; (2) by having its property subject to a receivership; and (3) by paying the claims of creditors other than the

United States in alleged derogation of the United States' federal priority. *See Whitney* 654 F.2d at 610 (holding that a preferential transfer is an "act of bankruptcy" which triggers the application of the Federal Priority Statute). Nevertheless, WHC contends that there are four reasons why Plaintiff is not entitled to relief under the Federal Priority Statute. First, WHC argues that IFA's Medicare debt did not arise until after WHC satisfied the claims of competing creditors. Next, WHC contends that it did not receive notice of the Medicare debt until after claims of other creditors were paid. Additionally, WHC asserts that the claims which it did pay had a higher priority than the United States' claim. Finally, WHC argues that the United States knew of IFA's insolvency and of the foreclosure proceedings involving the VCC facility but proceeded to disburse Medicare funds to the VCC without making required adjustments to avoid the overpayment which resulted. Thus, WHC contends that it is entitled to judgment as a matter of law.

### a. When IFA's Medicare Indebtedness Arose

■ WHC argues that Plaintiff is not entitled to relief under the Federal Priority Statute because IFA did not become indebted to the United States until after WHC satisfied the claims of the non-federal creditors over which the United States is asserting priority. *See In re Metzger,* 709 F.2d at 34–35 (holding that the United States was not entitled to priority where the debt did not arise until after the act of bankruptcy occurred); *Cerilli v. Newport Offshore, Ltd.,* 624 A.2d 835, 838 (R.I.1993) (citing *Metzger,* 709 F.2d at 34–35) ("[I]n order to qualify for first priority in payment under 31 U.S.C. § 3713(a), the debt owed to the United States Government must be in existence at the time the insolvent person assigns the property, an absent debtor has his or her property attached, or an act of bankruptcy is committed."). Specifically, WHC asserts that IFA's Medicare debt did not

arise until October 26, 1995, the date on which Medicare Northwest issued written notice of the overpayment. As such, WHC contends that it is only liable to the United States, if at all, for those amounts it may have improperly paid to private creditors after that date.

In support of its position, WHC relies primarily on state court decisions from other jurisdictions which have interpreted the meaning of the terms "indebtedness" or "debts due" as they relate to the Federal Priority Statute. In particular, WHC relies on *Leggett v. Southeastern People's College,* 234 N.C. 595, 68 S.E.2d 263, 267 (1951), for the proposition that a debt does not accrue until "all events have occurred which fix and determine the liability of the debtor, to the creditor." In this case, WHC asserts that the event which fixed and determined IFA's liability to Medicare did not occur until the fiscal intermediary issued the written notice of overpayment on October 26, 1995. Relying on the federal regulations governing Medicare payments, WHC contends that the Government had no basis for the recovery of an overpayment until that date. *See* 42 C.F.R. § 405.1803(c) ("The intermediary's determination contained in its notice is the basis for making retroactive adjustment . . . to any program payments made to the provider . . . including recoupment . . . of any overpayments to the provider identified in the determination.").

Unfortunately for WHC, its position completely ignores the operation of the statutory and regulatory provisions raised by Plaintiff in its opposition brief. Specifically, Plaintiff asserts that IFA's Medicare indebtedness arose, as a matter of law, no later than the date on which the VCC's cost report was due because that is the date on which a final determination of overpayment was made pursuant to 42 U.S.C. § 1395g(d) and 42 C.F.R. § 405.376 (1993). Under the latter provision, interest on any Medicare overpayment due accrues from the date a final determination that such overpayment has occurred. 42

C.F.R. § 405.376(b)(2). A number of events constitute a final determination of overpayment for purposes of that regulation, including the following:

(i) A Notice of Amount of Program Reimbursement (NPR) is issued . . . and . . . (A) A written demand for payment is made . . .

(iv) The due date of a timely-filed cost report that indicates an amount is due HCFA and is not accompanied by payment in full. . . .

(v) With respect to a cost report that is not filed on time, the day following the date the cost report was due (plus a single extension of time not to exceed 30 days if granted for good cause), until the time a cost report is filed. . . .

42 C.F.R. §§ 405.376(c)(i), (iv) and (v). These regulations clearly establish that an NPR is not the only basis on which a final determination of overpayment may occur. Rather, a Medicare debt arises as of the due date of a timely-filed cost report, and interest on the debt accrues from that date. Thus, despite WHC's assertion to the contrary, the VCC Medicare debt existed as of November 13, 1994, the date on which the VCC cost report was due. Therefore, summary judgment is inappropriate on this basis.

### b. Whether WHC had Notice of the Medicare Debt

■ According to the Ninth Circuit, a court-appointed receiver charged with managing and controlling an insolvent debtor's assets may only be held personally liable under the federal priority statute when the receiver *knowingly* distributes the insolvent debtor's assets in disregard of the Government's claim. *Crocker,* 313 F.2d at 948–49 (emphasis added). In this case, Plaintiff is asserting priority over all amounts paid by WHC to creditors other than the United States after November 13, 1994, the day on which the VCC's final Medicare cost report was due. *See* Holloway Affidavit (Docket # 31, Exhibit "K").

However, WHC argues that the notice of Medicare overpayment issued by Medicare Northwest on October 26, 1995, constituted the earliest date on which WHC knew of the overpayment. Thus, WHC contends that it is not liable to the United States for any payments it made to the VCC's non-federal creditors prior to that date.

In support of its position, WHC relies on *United States v. Vibradamp Corporation*, 257 F.Supp. 931 (S.D.Cal.1966). In *Vibradamp*, the United States sued the executors of an estate to recover sums due under a Government contract guaranteed by the decedent and one of the executors several years earlier. The United States did not file a claim in the probate proceedings and did not otherwise notify the executors that it would be asserting its claim. Subsequently, the executors distributed the entire estate to parties other than the United States. The district court determined that the executors were not liable to the United States for a violation of the Federal Priority Statute because they did not have notice of the debt due the United States at the time of distribution. *See id.* at 935 ("[T]he notice required is actual knowledge of such facts as would put a prudent person on inquiry as to the existence of the claim of the United States."). In doing so, the court reasoned that although one of the executors knew of the existence of the guaranty, he did not have the requisite knowledge of the Government's intention to assert the liability because the Government sat on its claim for over twelve years. *See id.* at 936 (noting that " 'actual notice of the government's intention' to assert liability is much different than recollection of the execution of a twelve year old guaranty and awareness of the possibility that it might form the basis of a claim.").

WHC argues that the facts of this case are similar to those presented in *Vibradamp* in that WHC was only aware of the possibility of a government debt at the time it distributed the debtor's assets. WHC further contends that the debt's existence was not ascertainable until the intermediary issued its final determination of overpayment. Therefore, WHC argues that it did not have "actual knowledge" of the debt October 26, 1995. Accordingly, WHC submits that its liability extends only to those amounts it paid to non-federal creditors after that date. However, WHC fails to address evidence in the record which suggests that WHC had knowledge of facts which would put a prudent person on inquiry as to the existence of the Medicare debt even before the NPR was issued, thus distinguishing this case from that of *Vibradamp*.

As Plaintiff points out in its opposition brief, there are numerous indications throughout the record that WHC may have been aware of the existence of the Medicare debt even prior to October 26, 1995. First, Plaintiff has presented competent evidence from which a reasonable fact finder could infer that WHC may have begun purposefully inflating its therapy billing rates in the spring of 1994 so as to create overpayments from Medicare. It is undisputed that WHC had contract with Sundance Rehabilitation Corporation ("Sundance") whereby Sundance would provide therapy rehabilitation services to VCC's patients. It is also undisputed that VCC's costs under that contract were fixed on a per-unit basis. However, according to Beth Harris, the Supervisor of Reimbursement for Medicare Northwest, and Patrick Colton, the Audit Supervisor for Medicare Northwest, WHC began submitting charges for therapy that were many times greater than its actual costs. (Harris Declaration (Docket # 43), ¶¶ 7–11; Colton Declaration (Docket # 45), ¶¶ 6–9). Based on a Interim Rate Review report issued by Medicare Northwest on April 14, 1994, WHC knew that Medicare Northwest would disburse interim payments at a rate of 90% of all Part A charges and 100% of all Part B charges billed by the VCC. (Harris Declaration (Docket # 43), Exhibit 1). However, only those costs actually incurred by VCC were ultimately compen-

sable. (*Id.*, ¶ 12). Thus, the inflated billing rates created an overpayment for which the VCC was responsible at the end of the fiscal year.

WHC attempts to refute Plaintiff's assertion of overbilling by pointing to the billing invoices submitted to the VCC by Sundance. (Second Holloway Affidavit (Docket # 56), Exhibit B). However, WHC appears to miss the point. Sundance's billing invoices reflect the VCC's actual costs of providing therapy to patients. They say nothing about the therapy charges the VCC claimed in order to receive interim payments. In fact, VCC's own 1994 cost report reflects the significant discrepancies between the amount of therapy costs the VCC actually incurred versus the amount of charges claimed. (Colton Declaration (Docket # 45), Exhibit 2, Worksheet C). According to that document, the VCC's cost to provide physical therapy to its patients amounted to $79,-239; however, the total charges reflected for physical therapy were $208,555. Similarly, the VCC's cost for providing occupational therapy was $86,657; yet the total charges claimed were $251,304. Finally, the VCC's cost for providing speech therapy was documented as $86,631; but it charged $262,010 for those services. In light of the fact that these figures are contained in a cost report which WHC prepared, there is at least a question of fact as to whether WHC knew of the Medicare overpayment prior to receiving the intermediary's written notice of determination.

That WHC may have known of the Medicare debt prior to October 26, 1995, is also evidenced by its own accounting practices. According to Mr. Holloway, WHC kept track of the VCC's finances by generating statements and ledgers reflecting accounts payable and accounts receivable. (Holloway Affidavit (Docket # 31), Exhibit A: Holloway Deposition, p. 145). In fact, a VCC balance sheet dated December 31, 1994, indicated that the VCC owed Medicare $213,091 for the overpayment of funds it had received. (McChesney Declaration (Docket # 42), Exhibit 10). For WHC to now contend that it had no knowledge of this overpayment prior to receiving written notice is, to say the least, inconsistent with the evidence of record as to this issue.

Based on the foregoing evidence, the Court concludes that genuine issues of material fact exist which preclude summary judgment as to whether WHC knowingly distributed IFA's assets in derogation of the Medicare claim.

**c. Whether the U.S. Claim is Entitled to Priority**

■ WHC argues that even if the Federal Priority Statute is applicable to the facts of this case, Plaintiff is not entitled to relief thereunder because its claim did not have priority over the competing claims paid by WHC in satisfaction of the administrative expenses of the receivership. It has long been settled that administration expenses of a receivership take precedence over claims asserted by the Government pursuant to 31 U.S.C. § 3713. *Abrams v. United States*, 274 F.2d 8, 12 (8th Cir. 1960). *See also, Kennebec Box Co. v. O.S. Richards Corp.*, 5 F.2d 951 (2d Cir.1925) (holding that the expenses of the receivership were entitled to priority over taxes due the government where the government's debt was not secured by a lien); *Matter of Receivership of Hollingsworth*, 386 N.W.2d 93, 97 (Iowa 1986) ("The government's priority is subject to proper receivership expenses."). Here, WHC argues that each of the payments it made in alleged derogation of the federal claim were all necessary and reasonable expenses incurred by the receiver for the purpose of preserving the assets subject to receivership. Therefore, it contends that it is not liable for the amounts claimed against it in this proceeding. Plaintiff disagrees.

■ Plaintiff does not dispute that its priority is subject to debts incurred in furtherance of the administration of an insolvent's estate. However, Plaintiff does

challenge the nature of the payments made by WHC in this case. Plaintiff argues that after the VCC was sold, there was no business to preserve. Thus, Plaintiff contends that any payments made by WHC after September 30, 1994, were not payments made to preserve the assets of the estate. Plaintiff specifically challenges the propriety of payments made to Sundance Rehabilitation Corporation for therapy services, management fees paid by WHC to itself and the payment of legal fees after the facility was sold. Relying on *Lakeshore Apartments, supra,* and *United States v. Moriarty,* 8 F.3d 329 (6th Cir. 1993), Plaintiff argues that these payments were nothing more than preferential transfers made in derogation of a federal claim which WHC knew existed. However, as WHC points out, neither of those cases concerned a circumstance wherein the debtor's representative was satisfying administrative expenses before paying the Government's debt. Furthermore, Plaintiff's argument does not take into account the fact that the receivership was not terminated until September 26, 1997, over three years after the physical facility was sold. (Holloway Affidavit (Docket # 31), Exhibit K).

A list of expenses paid by WHC over which Plaintiff is asserting priority is contained in WHC's Statement of Undisputed Facts (Docket # 59) and is also attached to Plaintiff's opposition brief (Docket # 48, Exhibit 2: WHC's Answers to Plaintiff's First Requests For Admissions, Request for Admission No. 17, pp. 6–7). The payments occurred between November 18, 1994, and May 20, 1997, when the VCC was still subject to the receivership. Although WHC contends that each of the payments was made in furtherance of the administration of the receivership, that question is one of fact not amenable to disposition as a matter of law. Accordingly, summary judgment is inappropriate on this basis.

### d. Whether the U.S. Failed to Adjust the Medicare Payments to avoid Overpayment

■ Finally, WHC argues that Plaintiff is not entitled to relief under the Federal Priority statute because Medicare Northwest, acting on behalf of the United States Government, failed to adjust VCC's Medicare payments so as to avoid the overpayment which resulted in 1994. WHC contends that Medicare Northwest was required to do so pursuant to 42 C.F.R. § 413.64(i). That regulation provides in relevant part:

> If on the basis of reliable evidence, the [Medicare] intermediary has a valid basis for believing that, with respect to a provider, proceedings have been instituted in a State or Federal court for purposes of determining whether such provider is insolvent or bankrupt under an appropriate State or Federal law, any payments to the provider will be adjusted by the intermediary ... to a level necessary to insure that no overpayment is made.

*Id.* The duty of the intermediary to monitor Medicare payments to a financially distressed health care provider is similarly set forth in the Provider Reimbursement Manual ("PRM"):

> If the provider's financial condition as disclosed by its financial records, reports, or other reliable information establishes that the provider is or may become insolvent or involved in receivership or bankruptcy proceedings, the intermediary will maintain careful surveillance over the provider's interim payment to ensure that no overpayment to the provider is made.

Part I, § 2404.4. (*See* Second Holloway Affidavit (Docket # 56), Exhibit C).

Here, WHC argues that Medicare Northwest was provided ample reliable information that the VCC and its owners were involved in bankruptcy and foreclosure proceedings. In fact, Mr. Holloway testified in his affidavit that Medicare

Northwest was specifically kept informed of the VCC's financial condition from the time WHC made application with Medicare Northwest to become its intermediary until the time the VCC ceased participating in the Medicare program. (Holloway Affidavit (Docket # 31), p. 5). WHC asserts that despite this information, Medicare Northwest never made adjustments to the VCC's interim payments as required to ensure that no overpayment resulted. However, WHC's assertion is unsupported by the record.

As Plaintiff points out, there is evidence in the record that Medicare Northwest did, in fact, conduct a rate review in April of 1994 to establish the appropriate interim payment rate for the VCC facility. (Harris Declaration (Docket # 43), Exhibit 1). Thus, it did take steps to monitor the VCC's interim payment based on the information it had available to it, i.e. the VCC's 1993 cost report. (*Id.*). However, there is a question of fact as to whether that effort was thwarted by WHC. For if WHC did deliberately inflate its therapy billing rates without informing Medicare Northwest as Plaintiff contends, it would appear that WHC was responsible for the overpayment VCC received in 1994. Again, it is not this Court's function to make such factual determinations. Therefore, summary judgment as to this issue must be denied.

**2. WHC's Liability under Theories of Constructive Trust and Unjust Enrichment**

In its Fourth Claim for Relief, Plaintiff alleges that WHC improperly received and diverted Medicare payments made to the VCC after the facility was sold in July of 1994. (Amended Complaint (Docket # 20), ¶¶ 28–29). Plaintiff further alleges that WHC would be unjustly enriched if it were allowed to retain those funds. (*Id.*, ¶ 29). Accordingly, Plaintiff seeks the imposition of constructive trust on those amounts. (*Id.*).

 The imposition of a constructive trust is "an equitable remedy designed

to prevent injustice." *In re Dobbs,* 115 B.R. 258, 269 (Bkrtcy.D.Id.1990). Whether such a remedy is appropriate in any given case is a matter of state law. *Id.* The Idaho Supreme Court has explained the contexts in which a constructive trust may arise as follows:

> A constructive trust arises where legal title to property has been obtained through actual fraud, misrepresentations, concealments, taking advantage of one's necessities, or under circumstances otherwise rendering it unconscionable for the holder of legal title to retain beneficial interest in property.

*Hettinga v. Sybrandy,* 126 Idaho 467, 470, 886 P.2d 772, 775 (1994) (quoting *Witt v. Jones,* 111 Idaho 165, 168, 722 P.2d 474, 477 (1986)). *See also, Klein v. Shaw,* 109 Idaho 237, 240, 706 P.2d 1348, 1351 (Ct. App.1985) ("Constructive trusts are created by courts of equity whenever title to property is found in one who in fairness ought not to be allowed to retain it.").

 In the present case, WHC contends that Plaintiff's claim for a constructive trust must fail as a matter of law because there are no facts of record which would support its imposition. Specifically, WHC contends that it never held title to the Medicare funds which Plaintiff seeks to recover. *See Lynn v. Ingalls,* 100 Nev. 115, 676 P.2d 797, 801 (1984) ("Although the receiver holds the property for the benefit of the party who is ultimately determined to be entitled to it, title to the property does not change by the mere appointment of a receiver."). Instead, WHC asserts that title to the Medicare funds passed directly to IFA and that the funds were merely held and distributed by WHC for the benefit of VCC patients.

While WHC may not have held title to the Medicare overpayment funds, Plaintiff points out that it did exercise complete control over them during the relevant time frames. (Docket # 48, Exhibit 1: WHC's Answer to Plaintiff's Interrogatories, Interrogatory No. 1, pp. 1–2). Thus, one of

the issues to be resolved on summary judgment is whether exclusive custody and control on the part of a wrongdoer is sufficient to warrant the establishment of a constructive trust under Idaho Law. Plaintiff has not provided the Court with any authority which supports this proposition. However, one of the cases cited by WHC, *Chinchurreta v. Evergreen Management, Inc.*, 117 Idaho 591, 790 P.2d 372 (1989), provides some guidance.

In *Chinchurreta*, the Idaho Court of Appeals recognized that a constructive trust is an appropriate remedy "in practically any case where there is a wrongful acquisition or detention of property to which another is entitled." *Id.* at 593, 790 P.2d at 374. Here, Plaintiff is clearly alleging that WHC wrongfully acquired and detained Medicare funds to which it, acting on behalf of the VCC, was not entitled. Those allegations rise to the level of fraud on the part of WHC and, if true, would certainly warrant the imposition of a constructive trust under Idaho law. As the court noted in *Chinchurreta*,

> "[t]he only problem of great importance in the field of constructive trusts is to decide whether, in the numerous and varying fact situations presented to the courts, there is a *wrongful holding of property* and hence a potential unjust enrichment of the defendant."

*Chinchurreta*, 117 Idaho at 593, 790 P.2d at 374 (quoting G. Bogert, *Handbook of the Law of Trusts* (5th ed.1973), at 290) (emphasis added).

In this case there is quite clearly a question of material fact as to whether WHC engaged in any wrongful conduct with respect to the Medicare payments it received on behalf of the VCC after the facility was sold at the foreclosure sale on July 29, 1994. WHC admits that it continued to receive Medicare payments following that date. However, it asserts that it was entitled to do so because its receivership duties did not end until WHC was ordered to deliver possession of the VCC to its new owner on September 30, 1994.

Plaintiff, on the other hand, contends that WHC actively engaged in fraudulent conduct in order to obtain Medicare payments to which it was not entitled. In particular, Plaintiff argues that WHC received notice of the foreclosure sale in March of 1994, but failed to notify Medicare Northwest of the sale as required by federal regulations. (Harris Declaration (Docket # 43), Exhibit 10). Plaintiff also argues that WHC began deliberately inflating its billing rates shortly after receiving notice of the foreclosure sale. According to Plaintiff, WHC concealed its activities in order to secure a large Medicare overpayment which it could then use to pay itself and other creditors.

As has been previously discussed, all of Plaintiff's allegations find some support in the record. Thus, viewing the facts and evidence in the light most favorable to Plaintiff, a reasonable fact finder could conclude that WHC wrongfully acquired the Medicare funds and that it was unjustly enriched thereby. Accordingly, summary judgment is inappropriate.

### C. Conclusion as to WHC's Motion for Summary Judgment

Based on the foregoing, the Court concludes that genuine issues of material fact exist which preclude the granting of summary judgment in WHC's favor. Plaintiff has come forward with ample evidence creating triable issues of fact as to each cause of action alleged against WHC in its Amended Complaint. Therefore, the Court recommends that WHC's Motion for Summary Judgment be denied.

### III. IFA's Second Motion to Dismiss Cross–Claim (Docket # 33)

Defendant IFA seeks an order dismissing Defendant WHC's cross-claim against it. IFA asserts that dismissal is warranted because WHC has failed to comply with the Court's scheduling deadlines in that it did not seek leave to amend to add the cross-claim. Further, IFA contends that the cross-claim is barred by the doctrine of

res judicata because it has already been decided on its merits.

This is not the first time IFA has brought a motion to dismiss a cross-claim asserted by WHC. WHC originally filed a cross-claim against IFA and ID.7 on July 2, 1997, in conjunction with its Answer to Plaintiff's original Complaint. (Docket # 5). On July 25, 1997, IFA moved to dismiss that cross-claim on the grounds that it failed to state a claim on which relief could be granted. WHC failed to respond to IFA's motion within the 14 day period proscribed by Local Rule 7.1(a). The Court then notified WHC that a response was past due and extended the response period until August 23, 1997. That deadline also passed without response. Judge Winmill's staff then went the extra mile and initiated a telephone call to WHC's counsel, informing him that the deadline for response would be further extended to September 4, 1997. Despite all of these opportunities, WHC still failed to respond. Pursuant to Local Rule 7.1(f), Judge Winmill deemed WHC's failure to respond as a consent to the granting of the motion. Accordingly, on September 5, 1997, Judge Winmill entered an order dismissing WHC's entire cross-claim *with prejudice*. (Docket # 11).

Several months following the entry of the above order, this Court granted the United States leave to file an Amended Complaint. The Amended Complaint was filed on July 8, 1998. Thereafter, the Defendants filed Answers to the Amended Complaint. However, included within WHC's Answer was another cross-claim against IFA and ID.7. (Docket # 26). This is the cross-claim at which the present motion to dismiss is directed.

WHC's most recent cross-claim is merely a restatement of the cross-claim which was dismissed with prejudice in September of 1995. Thus, IFA asserts that it should be dismissed as a matter of law. In support of its position, IFA points first to the Court's scheduling order which required that any amendment of pleadings must be completed on or before June 30, 1998. IFA contends that in bringing its "amended cross-claim," WHC failed to comply with this order. Furthermore, IFA contends that the doctrine of res judicata precludes WHC from asserting a second cross-claim against IFA and ID.7 because the dismissal of the first cross-claim was with prejudice and was on the merits. *See* Fed.R.Civ.P. 41(b) (unless otherwise provided, a dismissal of an action or claim for failure to comply with the Federal Rules, or with any order of the court, operates as an adjudication upon the merits).

Once again, WHC failed to file a written response to IFA's motion. However, at the hearing in this matter, WHC contended that it was entitled to file its newest cross-claim as a "fresh response" to Plaintiff's Amended Complaint. As the Court indicated at the hearing, this argument is without merit. WHC may not proceed through the "back door" to reassert a claim which has already been decided on the merits merely because an Amended Complaint has been filed. Although WHC was entitled to respond to the new allegations contained in the Amended Complaint, it was not entitled to renew what essentially is its own complaint against the other Defendants in this action without seeking leave of the Court to do so.

WHC was given every opportunity to defend its cross-claim when IFA sought to have the claim dismissed over two years ago. Nevertheless, WHC failed to do so, and the cross-claim was dismissed *with prejudice* for WHC's failure to comply with the Court's local rules. Accordingly, the Court recommends that IFA's Second Motion to Dismiss WHC's Cross-claim be granted and that the amended cross-claim, which never should have been pled in the first place, be dismissed in its entirety.

### IV. Motions to Dismiss Amended Complaint (Docket # 60 and Docket # 69)

#### A. Dismissal Standard

Defendants IFA and ID.7 challenge Plaintiff's Complaint for failure to state a

claim on which relief can be granted. A motion to dismiss should not be granted "unless it appears beyond doubt that Plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir.1994). When a complaint or portion thereof is tested as to the legal sufficiency of the claims for relief, all allegations of material fact in the complaint are taken as true and construed in the light most favorable to the moving party. *Buckey v. County of Los Angeles*, 968 F.2d 791, 794 (9th Cir.1992), *cert. denied*, 506 U.S. 999, 113 S.Ct. 599, 121 L.Ed.2d 536 (1992).

 The Ninth Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegations of other facts." *Cook, Perkiss & Liehe, Inc. v. Northern California Collection Service, Inc.*, 911 F.2d 242, 247 (9th Cir.1990). While amendments are liberally permitted under Fed.R.Civ.P. 15(a), the district court may deny leave to amend when there has been an undue delay in bringing the motion, and the opposing party would be unfairly prejudiced by the amendments. *U.S. v. Pend Oreille Public Utility Dist. No. 1*, 28 F.3d 1544, 1552–53 (9th Cir.1994), *cert. denied*, 514 U.S. 1015, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995).

## B. Discussion

Defendants IFA and ID.7 (hereinafter collectively "Defendants") each move to dismiss Plaintiff's Complaint on the grounds that it fails to state a claim for which relief can be granted.[4] Defendants contend that there are two reasons why Plaintiff's claims against them must fail. First, Defendants argue that Plaintiff can prove no set of facts to support a recoup-

ment action against them because they were without fault in creating the Medicare overpayments made to VCC. As such, Defendants maintain that Plaintiff is barred by the "recoupment prohibitions" set forth in 42 U.S.C. § 1395gg from looking to them for repayment of the Medicare debt. Next, Defendants argue that Plaintiff has not alleged any facts which, if true, support a cause of action against them under the Federal Priority Statute. Accordingly, Defendants submit that Plaintiff's claims against them must be dismissed.

In response, Plaintiff initially argued that the "Recoupment Prohibition" of 42 U.S.C. § 1395gg does not apply to the collection of Medicare overpayments determined after review of a Provider's cost report. Instead, Plaintiff contended that section 1395gg pertains only to recoupment of excess payments made on *individual* claims. Thus, Plaintiff asserted that Defendants' reliance on section 1395gg as a defense to Plaintiff's recoupment action was misplaced. Furthermore, Plaintiff argued that it had stated a claim against IFA and ID.7 under the Federal Priority Statute but that discovery was required before specific facts could be determined with respect to that claim.

During the hearing in this matter, Plaintiff's counsel raised an even more fundamental argument as to the validity of Defendants' section 1395gg "without fault" defense. Specifically, Plaintiff argued that this Court lacks subject matter jurisdiction to entertain Defendants' section 1395gg defense because Defendants did not raise the issue before the Secretary of Health and Human Services as required by 42 U.S.C. § 405(h). In light of the fact that Plaintiff's counsel had not previously raised this argument in its briefing, the Court directed the parties to submit supplemental briefing as to the jurisdiction issue. The Court is now in receipt of the

---

4. In support of its motion, IFA adopts ID.7's Memorandum at Law and Reply Memoran- dum.

parties' supplemental memorandums and finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by conducting another hearing on the jurisdiction issue, this matter shall be decided on the record before this Court without further oral argument.

### 1. Whether the Court has Subject Matter Jurisdiction to Entertain Defendants' Section 1395gg "Without Fault" Defense

■ Defendants seek to avoid liability for the Medicare overpayments at issue in this case by invoking the "without fault" defense contained in 42 U.S.C. § 1395gg. However, Plaintiff argues that the Court is without jurisdiction to consider the merits of Defendants' section 1395gg "without fault" defense because Defendants failed to exhaust their administrative remedies with respect to the final overpayment determinations. Specifically, Plaintiff asserts that Defendants never appealed the overpayment determinations to the Provider Reimbursement Review Board as provided in 42 U.S.C. § 1395oo. As such, Plaintiff contends that this Court is precluded by 42 U.S.C. § 405(h) from undertaking a judicial review of those determinations. For the following reasons, the Court agrees.

42 U.S.C. § 405(h) is a provision of the Social Security Act incorporated into the Medicare Act by 42 U.S.C. § 1395ii. By its terms, section 405(h) provides that a court may not undertake judicial review of final Medicare determinations except as expressly provided for in the Medicare Act. Specifically, section 405(h) states:

> **Finality of [Secretary's] decision.** The findings and decisions of the [Secretary of the Department of Health and Human Services] after a hearing shall be binding upon individuals who were parties to such hearing. No findings of fact or decisions of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the [Secretary], or any officer or employee thereof shall be brought under[28 U.S.C. §§ 1331 or 1346], to recover on any claim arising under this title.

42 U.S.C. § 405(h). Despite Defendants' contentions to the contrary, this provision does not merely apply to actions brought against the government to recover benefits under the Medicare Act.[5] Rather, the second sentence of section 405(h) makes clear that a court is precluded from undertaking judicial review of any findings of fact or decisions of the Secretary except as provided in the Medicare Act itself.

Prior to 1972, the Medicare Act contained no administrative procedure for appealing fiscal intermediary NPR determinations. However, in 1972, Congress amended the Medicare Act to include section 1395oo. Pursuant to this provision, dissatisfied providers are required to appeal adverse NPR determinations to a Provider Reimbursement Review Board ("PRRB")—an administrative hearing panel—within 180 days after receiving notice of the fiscal intermediary's final determination. 42 U.S.C. § 1395oo(a). Only after

---

**5.** Defendants rely on an Eleventh Circuit decision for the proposition that section 405(h) was designed solely to prevent beneficiaries and providers from seeking judicial review of benefits determinations prior to exhausting their administrative remedies with respect to such claims. *See United States v. Blue Cross and Blue Shield of Alabama, Inc.*, 156 F.3d 1098 (11th Cir.1998). However, the issue before the court in *Blue Cross* was not whether section 405(h) was applicable to claims brought by the government to recover Medi-

care overpayments, but whether section 405(h) precluded judicial review in an action brought under the False Claims Act by a former employee of a fiscal intermediary who alleged that the fiscal intermediary had knowingly presented fraudulent Medicare claims to the government. In that context, the court held that the action did not "arise under" the Medicare Act as contemplated by the *third* sentence of section 405(h) and that jurisdiction was therefore proper. *Id.* at 1110.

the PRRB renders its final decision may an provider obtain judicial review of the NPR determination. 42 U.S.C. § 1395oo(f). In fact, the Ninth Circuit has held that "the incorporation of section 405(h) into the Medicare Act makes the provider appeal procedures in 42 U.S.C. § 1395oo, which governs appeals for cost-reporting years ending on or after June 30, 1973, a 'prerequisite to the Court's very jurisdiction.'" *United States v. California Care Corporation*, 709 F.2d 1241, 1246 (9th Cir.1983) (quoting *Pacific Coast Medical Enterprises v. Harris*, 633 F.2d 123, 138 (9th Cir.1980)).

In *California Care Corporation*, the Ninth Circuit was called upon to determine whether section 405(h) applied to an action brought by the government to recover overpayments made to Medicare providers. However, the court's inquiry was limited to whether section 405(h) barred judicial review of the provider's defense where the overpayments at issue were made with respect to *pre–1973 cost-reporting years*. The court ultimately held that the district court had jurisdiction to consider the provider's defense because there was no statutorily mandated procedure for provider appeal at the time. In doing so, the Court adopted the reasoning of the Second Circuit which had recently considered a similar issue and "concluded that to apply section 405(h) to bar judicial review of any defenses urged by providers would result in depriving providers of all judicial review." *Id.* at 1246 (citing *United States v. Aquavella*, 615 F.2d 12, 20–21 (2d Cir. 1979)).

The facts of this case are very different than the facts of *California Care Corporation* and *Aquavella*. In this case, the Medicare overpayments at issue occurred long after the 1973 cost-reporting years. Thus, the statutorily mandated provider appeal procedures set forth in 42 U.S.C. § 1395oo were already in place. Nevertheless, Defendants failed to challenge the overpayment determinations in accordance with those procedures. Instead, Defen-

dants waited until the government initiated the present lawsuit to raise their section 1395gg "without fault" defense. This defense is, in essence, a substantive challenge to the fiscal intermediary's NPR determinations and should have been raised before the PRRB. *See United States v. Sanet*, 666 F.2d 1370, 1374 ("It is inconsistent to prevent a party from obtaining judicial review of an administrative determination while permitting judicial determination when a party avoids the administrative determination and waits to be sued."). Accordingly, the Court finds that it is precluded by 42 U.S.C. § 405(h) from reviewing the merits of Defendants' section 1395gg claim.

Defendants suggest that the Court should waive the exhaustion requirement of 405(h) in this instance because ID.7 and IFA lacked the ability to bring their claims to the Secretary during the period of receivership. However, this argument is without merit. Defendants cite no authority for the proposition that the receivership somehow divested IFA and ID.7 of the authority to exercise their own legal rights. On the contrary, the record indicates that IFA and ID.7 continued to exercise their authority, at least with respect to the Medicare provider contract, throughout the period of receivership. In fact, it was Stuart Berry, Executive Vice President of ID.7, who reaffirmed the Medicare provider agreement on June 14, 1991, over one year after WHC was appointed receiver of the VCC facility. (Haffie Declaration (Docket # 64), ¶ 3 and Attachment 1).

The Court also rejects Defendants' contention that neither IFA nor ID.7 had the opportunity to contest the overpayment determinations at the administrative level. The record is clear that IFA received a copy of the 1994 NPR. The notice, dated October 26, 1995, indicated that the VCC, operating under provider number 13–5091, owed Medicare $240,194.00 for the 1994 cost-report year. (Colton Declaration (Docket # 88), Attachment 1). The notice also set forth the procedures and require-

ments for filing an appeal with the PRRB. (*Id.*). IFA's attorney responded to the NPR by a letter dated November 1, 1995, in which he took the position that IFA was not responsible for the overpayments which had resulted. (*Id.*, Attachment 2). However, IFA never raised that argument before the PRRB as required by 42 U.S.C. § 1395oo.

Based on the foregoing, the Court finds that it is without jurisdiction to entertain Defendants' section 1395gg "without fault" defense. While it may be true that Defendants were not responsible for creating the overpayments at issue in this case, Defendants were given the opportunity to raise that argument before the Secretary and failed to do so. Having failed to exhaust their administrative remedies, Defendants cannot escape their contractual liability for the Medicare overpayments which resulted in this case. Defendants' remedy, if any, lies in a cross-claim against WHC.

### 2. Whether Plaintiff has Stated a Claim Against Defendants Under the Federal Priority Statute

Plaintiff's Third Claim For Relief alleges that Defendants are liable to the United States for any payments they made to other creditors in violation of the Federal Priority Statute, 31 U.S.C. § 3713. (Amended Complaint (Docket # 20), ¶ 25). Defendants argue that this cause of action must be dismissed because Plaintiff has failed to allege any facts which, if true, support a claim for relief under this statute.

As was previously discussed, the Federal Priority Statute creates a priority in favor of debts due the United States such that an insolvent debtor is required to pay a debt owing to the United States before paying the claims of competing creditors whenever the debtor commits an act of bankruptcy. *Id.; Whitney*, 654 F.2d at 610; *Lakeshore Apartments* 351 F.2d at 353. In this case, Plaintiff has alleged that IFA, or its representatives, may have made payments in violation of the Federal Priority Statute. (Amended Complaint (Docket # 20), ¶ 26). However, Plaintiff has failed to allege any particular facts which support this allegation. Nevertheless, the Court finds that this defect is not fatal. At the hearing, Plaintiff's counsel indicated that he entertained a good faith belief as to the factual bases of this claim. Thus, in keeping with the standard that a motion to dismiss should not be granted "unless it appears beyond doubt that Plaintiff can prove no set of facts in support of his claim that would entitle him to relief," *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir.1994), the Court recommends that Plaintiff be allowed to amend the Complaint to add facts that support this allegation.

### C. Conclusion as to IFA's and ID.7's Motions to Dismiss the Amended Complaint

Based on the foregoing, the Court recommends that Defendants' Motions to Dismiss the Amended Complaint be denied. Plaintiff has alleged facts sufficient to state a cause of action against IFA and ID.7 for the recovery of the Medicare overpayments at issue in this case. Because Defendants have failed to exhaust their administrative remedies with respect to the overpayment determination, the Court is without jurisdiction to consider the merits Defendants' defense to that claim. Furthermore, the Court finds that, as it is presently drafted, Plaintiff's Amended Complaint fails to allege sufficient facts to support claim for relief under the Federal Priority Statute. However, it does appear that the allegation of additional facts could cure the deficiencies noted herein. Therefore, dismissal is inappropriate as to this claim.

### *RECOMMENDATION*

Based on the foregoing, the Court being fully advised in the premises, THE COURT HEREBY RECOMMENDS that:

(1) Defendant Western Health Care's Motion for Summary Judgment (Docket # 29) be DENIED;

(2) Defendant Idaho Falls Associate's Motion to Dismiss Western Health Care's Cross Claim (Docket # 33) be GRANTED;

(3) Defendant ID.7 Valley Care's Motion to Dismiss Amended Complaint (Docket # 60) be DENIED; and

(4) Defendant Idaho Falls Associate's Motion to Dismiss Amended Complaint (Docket # 69) be DENIED.

Written objections to this Report and Recommendation must be filed within ten (10) days pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(d), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

Dated this 30th day of August, 1999.